[Nos. A027584, A031079. First Dist., Div. Three. June 17, 1987.]

CITY OF SAN JOSE, Plaintiff and Appellant, v.
GREAT OAKS WATER COMPANY, Defendant and Respondent.

COUNSEL

Orrick, Herrington & Sutcliffe, Richard E. V. Harris, Laurie J. Miller, Joan R. Gallo, City Attorney, and Sandra J. Fox, Deputy City Attorney, for Plaintiff and Appellant.

Wylie, Blunt, McBride & Jesinger and Richard J. Wylie for Defendant and Respondent

OPINION

WHITE, P. J.—The City of San Jose (City) appeals from a trial court grant of summary judgment, dismissal and award of attorney's fees entered in favor of respondent Great Oaks Water Company (Great Oaks). This action concerns the exercise of the right to provide water service within a portion of the San Jose water service area known as the "Expanded Edenvale Redevelopment Area, Phase I" (Edenvale Area). We affirm.

I

The plan for the Edenvale Area project was adopted by the City's Redevelopment Agency in or about August 1981. The plan provided for the industrial development of a southern portion of the City around Highway 101 near Coyote Creek, including the provision of utility services to permit and encourage such development.

Great Oaks had already requested and obtained certification from the California Public Utilities Commission (PUC) for the expansion of its certified service area within the boundaries of the Edenvale Area. This expansion of Great Oak's service area extended over only a small portion of the entire Edenvale Area (the Edenvale sub-area). Although Great Oaks did not have any facilities in place in the Edenvale sub-area and was not yet providing water there, it did have the right to install water lines and facilities in the future pursuant to the PUC certification expanding its service area. Moreover, Great Oaks had already built an operating system, including underground pipes, retaining tanks and wells, as the infrastructure upon which it would build the anticipated extension of its water service system into the Edenvale sub-area. Indeed, the Environmental Impact Report (EIR) prepared in September 1979 to address proposed expansion of the Edenvale Area specifically based its conclusions in large part on the assumption that the water service in the area would in fact be supplied by Great Oaks simply extending its existing system.

In 1983, the City entered into negotiations with developers with regard to the industrial development of the expanded Edenvale Area. In an agreement entered into on June 6, 1983, the City committed itself to providing all the necessary water services for the Edenvale Area by November 1, 1983. On or about June 14, 1983, the City formally notified Great Oaks that on June 28, 1983, the city council would consider adoption of a resolution of necessity authorizing the filing of eminent domain proceedings aimed at acquiring Great Oaks's "property interest" in its "PUC certified [water] service area easterly of Coyote Creek and southerly of U.S. Highway 101" in the Edenvale sub-area.

On or about June 23, 1983, the City gave Great Oaks a one-page "Appraisal-Acquisition Summary Statement." The statement, which expressly constituted the City's "written offer to purchase property" from Great Oaks "for an approved City project," listed the "Property to be Acquired" as the "[e]xtension of PUC-approved service area of Great Oaks Water Company easterly of Coyote Creek and southerly of U.S. 101," and set out the "appraised fair market value of the property" at $2,000.

On June 27, 1983, D. Kent Dewell, the City's director of public works, issued a memorandum to the city council pointing out that the agreement negotiated and entered into between the City and the developers of the Edenvale Area, and already approved by the city council, "provides that the City will construct necessary water facilities" to meet service requirements by November 1, 1983. This memorandum stated that the Redevelopment Agency had included this commitment in the agreement because it "felt that being able to offer a comprehensive infrastructure package to developers gave the Redevelopment Agency its strongest ability to negoitate [sic] for the quality, quantity and timeliness of development." The memorandum concluded by recommending that the city council approve the resolution of necessity authorizing the taking of Great Oaks's interest in the PUC-certified service area at issue.[1]

The question of the adoption of the resolution of necessity was raised at the city council meeting of June 28, 1983. Great Oaks's attorney spoke at the meeting and argued against adoption of the resolution. He stated that the letter from Charles Davidson, the City's consulting civil engineer, con-

[1] The June 27, 1983, memorandum stated: "The City Attorney's office reviewed the status of the Great Oaks certified area, and advised that it was appropriate to acquire the interests of Great Oaks in the area east of Coyote Creek. Based upon a[n undated] letter from [consulting civil engineer] Mr. Charles Davidson to the City, we are of the opinion that the nature of the Great Oaks facilities constructed to serve this area are two stubs which could be extended across Coyote Creek. To insure that there is no later duplication of service, we have been advised that the City should proceed at this point to acquire interests to serve the area east of Coyote Creek."

tained inaccuracies and was out-of-date with respect to Great Oaks's ability and capacity to obtain, store and deliver water; that unlimited drawing of water by the City from the existing underground water table in the Edenvale sub-area would result in damage to the water rights of Great Oaks; that Great Oaks had already spent in excess of $80,000 in anticipation of potentially serving the subject area; that in view of the fact that the City had already entered into a building contract with the developers in which the City undertook and promised to provide the water service for the area, it was impossible for the City to comply with the due process requirements of section 1245.235 of the Code of Civil Procedure and of the federal and state Constitutions; that the EIR would have to be revised to take into account and comment upon the impact on the underground water supply and water table of the City's unlimited pumping of water for this project; that the City had failed to comply with Government Code section 7267.2 because it had not provided Great Oaks with a written explanation of the basis upon which its $2,000 evaluation of Great Oaks's property rights was made; and that adoption of the resolution of necessity should be postponed pending further study of the relative merits of the provision of water service to the affected area by the City or Great Oaks. Mr. Dewell, the City's director of public works, responded that "if the City is to meet the commitments to provide water service ... by November 1st, which is the case, ... we must proceed expeditiously at this time to acquire the rights to proceed—the interest to proceed," and that if the decision on the resolution of necessity were delayed for further study, as suggested by Great Oaks, "the time frame obviously is getting squeezed to the point where we are going to probably not produce on our November 1st time frame." On Dewell's recommendation, the city council adopted the resolution of necessity.

The resolution of necessity adopted on June 28, 1983, declared that the public interest and necessity required that the City provide water service to the Edenvale sub-area, and that it was therefore necessary to acquire by proceedings in eminent domain the following described property: "All property of the Great Oaks Water Company employed in providing water service to its certificated service area southerly of U.S. 101 and easterly of Coyote Creek ... which is rendered inoperative, reduced in value, or rendered useless to Great Oaks Water Company for the purpose of providing water service to said service area by reason of the provision of water service by the San Jose Municipal Water System to this same area."

On July 14, 1983, the City filed its complaint in eminent domain, which stated the same definition of the property sought to be taken as that set forth in the resolution of necessity. Great Oaks answered and filed a motion for summary judgment. After oral argument, the trial court entered an order granting summary judgment on the grounds that, by failing to pro-

vide a written summary of the basis for determination of the value of the subject property prior to adoption of the resolution of necessity, the City had not complied with Government Code section 7267.2; and that the EIR was defective because it did not consider the effect of the City's control of the water supply and possible risks in connection therewith. Although the City requested that dismissal be made conditional, the trial court entered summary judgment for Great Oaks on April 4, 1984, unconditionally dismissing the complaint and ordering that Great Oaks recover its costs and litigation expenses pursuant to sections 1268.210 and 1235.140 of the Code of Civil Procedure. Great Oaks thereafter applied for attorney's fees; the City opposed this request. On October 15, 1984, the trial court granted Great Oaks's request and awarded it costs and attorney's fees in the amount of $24,587.31, which was the full amount requested in Great Oaks's memorandum of costs and attorney's fees. The City appealed separately from the summary judgment and the order of costs and attorney's fees; these appeals were subsequently consolidated.

## II

The City's first argument on appeal is that the trial court erred in granting summary judgment on the ground that the City had failed to comply with the requirements of Government Code section 7267.2.[2] The City urges that section 7267.2 could not be the basis for dismissal of its eminent domain complaint either because the statute is inapplicable to this action or because it merely establishes discretionary guidelines and not mandatory requirements; alternatively, the City contends that it actually did comply with the statute. None of the City's contentions on this question have merit.

On its face, the language of Government Code section 7267.2 is mandatory. The statute states that prior to adopting a resolution of necessity and "initiating negotiations" for the acquisition of real property, "the public entity *shall* establish an amount which it believes to be just compensation," "*shall* make an offer" to the property owner to acquire the property for that amount, and "*shall* provide the owner . . . with a written statement

---

[2]Government Code section 7267.2, subdivision (a), provides, in pertinent part, as follows: "Prior to adopting a resolution of necessity pursuant to Section 1245.230 and initiating negotiations for the acquisition of real property, the public entity shall establish an amount which it believes to be just compensation therefor, and shall make an offer to the owner or owners of record to acquire the property for the full amount so established, unless the owner cannot be located with reasonable diligence. The offer may be conditioned upon the legislative body's ratification of the offer by execution of a contract of acquisition or adoption of a resolution of necessity or both. In no event shall the amount be less than the public entity's approved appraisal of the fair market value of the property. . . . The public entity shall provide the owner of real property to be acquired with a written statement of, and summary of the basis for, the amount it established as just compensation. . . ."

of, and summary of the basis for, the amount it established as just compensation." (Italics added.) The use of the word "shall" in the above provisions contrasts with the statute's statement that "[t]he offer *may* be conditioned upon the legislative body's ratification of the offer by execution of a contract of acquisition or adoption of a resolution of necessity or both." (Italics added.)

The conclusion that the provisions of Government Code section 7267.2 are mandatory is strongly supported by other related statutes. Code of Civil Procedure section 1245.220 states that "[a] public entity may not commence an eminent domain proceeding until its governing body has adopted a resolution of necessity that meets the requirements of this article." The following section, 1245.230, which is itself referred to in Government Code section 7267.2, states: "*In addition to other requirements* imposed by law, the resolution of necessity *shall contain* all of the following: ... (c) A declaration that the governing body of the public entity has found and determined each of the following: ... (4) That either the offer *required* by Section 7267.2 of the Government Code has been made to the owner or owners of record, or the offer has not been made because the owner cannot be located with reasonable diligence." (Italics added.)[3]

The City relies on certain language in Government Code section 7267 and section 7274[4] and cites *Toso* v. *City of Santa Barbara* (1980) 101 Cal.App.3d 934 [162 Cal.Rptr. 210] in support of its contention that the provisions of section 7267.2 are merely discretionary guidelines and not

---

[3] The fact that the requirements of Government Code section 7267.2 are mandatory is made unavoidably clear by the final paragraph of section 1245.230 of the Code of Civil Procedure: "If at the time the governing body of a public entity is requested to adopt a resolution of necessity and the project for which the property is needed has been determined by the public entity to be an emergency project, which project is necessary either to protect or preserve health, safety, welfare, or property, the *requirements* of Section 7267.2 of the Government Code need not be a prerequisite to the adoption of an authorizing resolution *at the time*. However, in those cases the provisions of Section 7267.2 of the Government Code *shall be implemented* by the public entity *within a reasonable time thereafter but in any event, not later than 90 days after adoption of the resolution of necessity*." (Italics added.)

[4] Government Code section 7267 provides as follows: "In order to encourage and expedite the acquisition of real property by agreements with owners, to avoid litigation and relieve congestion in the courts, to assure consistent treatment for owners in the public programs, and to promote public confidence in public land acquisition practices, public entities shall, to the greatest extent practicable, be guided by the provisions of Sections 7267.1 to 7267.7, inclusive, except that the provisions of subdivision (b) of Section 7267.1 and Section 7267.2 shall not apply to the acquisition of any easement, right-of-way, covenant, or other nonpossessory interest in real property to be acquired for the construction, reconstruction, alteration, enlargement, maintenance, renewal, repair, or replacement of subsurface sewers, waterlines or appurtenances, drains, septic tanks, or storm water drains."

Government Code section 7274 provides as follows: "Sections 7267 to 7267.7, inclusive, create no rights or liabilities and shall not affect the validity of any property acquisitions by purchase or condemnation."

mandatory requirements. However, both the cited provisions of the Government Code and the decision in *Toso* v. *City of Santa Barbara* predate the 1982 and 1983 amendments of Code of Civil Procedure section 1245.230 adding the present requirement that the provisions of Government Code section 7267.2 be implemented prior to the adoption of any resolution of necessity (Stats. 1982, ch. 1059, § 1, p. 3833; Stats. 1983, ch. 1079, § 1, p. 3846), as well as the 1982 amendment of section 7267.2 itself to include an express reference to the adoption of a resolution of necessity "pursuant to [Code of Civil Procedure] Section 1245.230." (Stats. 1982, ch. 1059, § 3, p. 3834.) In addition, Code of Civil Procedure section 1250.410, which deals with awards of litigation expenses in eminent domain proceedings, now directs the court "[i]n determining the amount of such litigation expenses ... [to] consider the offer *required to be made* by the plaintiff pursuant to Section 7267.2 of the Government Code ...." This provision was also added in 1982. (Stats. 1982, ch. 1059, § 2, p. 3833, italics added.)

We conclude that the provisions of Government Code section 7267.2 are not merely discretionary guidelines, but mandatory requirements which must be observed by any public entity planning to initiate eminent domain proceedings through a resolution of necessity.

### III

■ Next, the City argues that even if the provisions of Government Code section 7267.2 are mandatory, the statute is not applicable to the instant action because there was no "real property to be acquired" under the terms of that statute. We disagree.

As set forth in both the resolution of necessity and the complaint in eminent domain, the interest sought to be taken by the City constituted all of Great Oaks's "*property* ... employed in providing water service to its certificated service area southerly of U.S. 101 and easterly of Coyote Creek which is rendered inoperative, reduced in value, or rendered useless to Great Oaks ... for the purpose of providing water service to said service area by reason of the provision of water service by the [City] to this same area." (Italics added.) Great Oaks had an operative system of underground pipes, retaining tanks and wells in its certificated service area which—while it did not yet physically extend into the Edenvale sub-area—served as the infrastructure for Great Oaks's anticipated future obligation to provide water service to the public in that area. Under applicable provisions of the Public Utilities Code, the diminution of value and damage to these preexisting facilities caused by the City's duplication of water service constitutes a taking of property for which Great Oaks is entitled to all the compensation and benefits appropriate under the laws of eminent domain to parties pro-

ceeding in inverse condemnation for the taking of any interest in real property. (Pub. Util. Code, §§ 1503, 1504; *San Gabriel Valley Water Co.* v. *City of Montebello* (1978) 84 Cal.App.3d 757, 762-767 [148 Cal.Rptr. 830].)

Moreover, throughout the instant eminent domain proceeding the City itself has referred to the interests of Great Oaks sought to be condemned as "real property": in the formal notice to Great Oaks of the City's intent to adopt a resolution of necessity, in the resolution of necessity itself, and in the declaration of the City's appraiser submitted to the trial court in support of the $2,000 market value of the subject property claimed by the City. We conclude on the basis of the applicable statutes, the facts in this case and the representations of the City itself, that the interests sought to be acquired and condemned herein are "real property" interests for purposes of the applicability of Government Code section 7267.2.

### IV

Having argued that the statute is inapplicable to this case, the City asserts in the alternative that it has complied with Government Code section 7267.2 in any event. We are not persuaded by this assertion.

The City's claim of compliance rests on its "appraisal-acquisition summary statement" submitted to Great Oaks just before the city council meeting at which the resolution of necessity was adopted. That document did present the $2,000 appraisal figure to Great Oaks; however, absolutely no "written statement of, and summary of the basis for" that amount was provided, contrary to the express requirement of Government Code section 7267.2. Although the City asserts that such a written summary was made available to Great Oaks, there is absolutely nothing in the record to support this assertion. There is certainly nothing in the letter from the City's consulting civil engineer which could be said to contain an analysis or summary of the basis for the City's $2,000 fair market evaluation. We conclude that the trial court did not err in finding that the City had failed to comply with the requirement of Government Code section 7267.2 by not providing a written summary of the basis for its determination of the value of the property prior to the adoption of the resolution of necessity.

### V

■ The City contends that the trial court erred in granting Great Oaks's motion for summary judgment on the grounds that the EIR was defective. It urges that Great Oaks's challenge to the validity of the EIR was untimely and improper; that the EIR was not defective as alleged; that the trial court overlooked material issues of fact precluding summary judg-

ment; and that because the Edenvale Area project was a redevelopment project, it was subject to more liberal review procedures under the California Environmental Quality Act (CEQA), which the trial court erroneously failed to consider. None of these contentions is meritorious.

Contrary to the City's position, Great Oaks's challenge to the EIR was not untimely or improper. The fact that Great Oaks did not file a challenge to the City's *original* EIR within 30 days of the filing of the City's notice of determination approving the EIR is immaterial. (Pub. Resources Code, § 21167, subd. (c).) Great Oaks has never challenged the EIR as originally adopted; rather it objected to the fact that no subsequent or supplemental EIR was prepared to consider the environmental impact of the City's substitution of itself for Great Oaks as the provider of water service in the Edenvale sub-area.

Great Oaks submitted evidence to the trial court below indicating that the City's decision to substitute itself for Great Oaks substantially changed the nature of the project by changing the sources of the water supply for the project. Whereas under the original project analyzed by the EIR Great Oaks would provide the Edenvale sub-area with water drawn from its own preexisting wells spread over a broad area, the City now proposed to provide all the water for the project itself from three new wells. These wells were to be drilled at such a depth as to pose a risk of overdraft of the underground water table, and in a location in close proximity to known, established underground toxic contamination from industry in the area. The EIR approved and adopted by the City based its conclusions on the assumption that Great Oaks would provide the water service for the Edenvale Area. That EIR was prepared in September 1979, and was approved by the City's Redevelopment Agency on March 25, 1980. The City's decision to substitute itself for Great Oaks as the water supplier for the project area was not made until the city council hearing on June 28, 1983. At no point was a supplemental EIR prepared to address the potentially serious environmental implications of the City's decision to change the nature of the water service for the project.

The CEQA provisions on the preparation of a subsequent or supplemental EIR are found at Public Resources Code section 21166. That statute provides that "[w]hen an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being

undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

This section is amplified by several provisions in title 14 of the California Administrative Code. First, a "subsequent EIR" must be prepared where changes are proposed in the project "which will require important revisions of the previous EIR ... due to the involvement of new significant environmental impacts not considered in a previous EIR ...." (Cal. Admin. Code, tit. 14, § 15162, subd. (a)(1).) Second, the responsible public agency may choose to prepare a "supplement" to an EIR rather than a subsequent EIR if the conditions necessitating a subsequent EIR exist, but "[o]nly minor additions or changes would be necessary to make the previous EIR adequately apply to the project in the changed situation." (Cal. Admin. Code, tit. 14, § 15163, subd. (a).) Such a supplemental EIR "need contain only the information necessary to make the previous EIR adequate for the project as revised," "shall be given the same kind of notice and public review" as is given to a draft EIR, may be circulated by itself without recirculating the previous draft or final EIR, and must be considered in conjunction with the previous EIR in the public agency's decision-making process. (Cal. Admin. Code, tit. 14, § 15163, subds. (b), (c), (d), (e).) Finally, in lieu of either a subsequent or supplemental EIR, the responsible agency may prepare an "addendum" to an EIR if none of the conditions requiring the preparation of a subsequent or supplemental EIR have occurred; "[o]nly minor technical changes or additions are necessary to make the EIR under consideration adequate under CEQA"; and "[t]he changes to the EIR made by the addendum do not raise important new issues about the significant effects on the environment." Such an addendum need not be circulated for public review, but can simply be included in or attached to the final EIR; and the responsible agency must consider the addendum in conjunction with the final EIR prior to making a decision on the project. (Cal. Admin. Code, tit. 14, § 15164.)

In the instant case, the City certified as final an EIR which literally did not address the revised project that the city counsel approved at its meeting on June 28, 1983. The city asserts that the original EIR as written in 1979 adequately addressed all the environmental consequences of constructing a new water system in the Edenvale Area. However, all the discussion of water services in the EIR is based on the assumption that Great Oaks would supply the water with its own existing facilities. The City's argument simply ignores the potentially adverse environmental impacts wrought by the change in the water supply system from one based on Great Oaks's preexist-

ing wells to one based on the City's proposed new wells in an area already known to have underground contamination of the water supply.

■ "The value of an EIR is as an informational document. [Citation.] It is '... the "heart" of CEQA [citation], the principal method by which environmental data are brought to the attention of the agency and the public.' [Citation.] 'The report ... may be viewed as an environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ... points of no return.' [Citation.] ... [¶] Furthermore, the failure to prepare a subsequent or supplemental EIR deprived the public, who relied on the EIR's representations, of meaningful participation .... 'In reviewing an EIR a paramount consideration is the right of the public to be informed in such a way that it can intelligently weigh the environmental consequences of any contemplated action and have an appropriate voice in the formulation of any decision.' [Citation.] 'Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal ... and weigh other alternatives in the balance....' [Citation.] '[A]n accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR. The defined project and not some different project must be the EIR's bona fide subject.' [Citations.]" (*Mira Monte Howeowners Assn.* v. *County of Ventura* (1985) 165 Cal.App.3d 357, 365 [212 Cal.Rptr. 127]; accord, *Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1024-1025 [192 Cal.Rptr. 325]; *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 192-200 [139 Cal.Rptr. 396].)

■ We conclude that the City violated CEQA by failing to make a determination whether a subsequent or supplemental EIR was required by the redesign of the project, or whether an addendum to the final EIR would suffice. There should be an opportunity for public hearings and comments prior to this determination. If at that time it does appear that the changes in the project design are sufficiently substantial to require revisions of the EIR—as appears to be the case from the evidence in the record—then a subsequent or supplemental EIR will be required. ■ ■ ■ The trial court therefore did not err in dismissing the City's eminent domain proceedings on this ground. (*Stevens* v. *City of Glendale* (1981) 125 Cal.App.3d 986, 998-999 [178 Cal.Rptr. 367].)[5]

---

[5] Great Oaks's challenge to the adequacy of the EIR was properly raised in the context of this eminent domain proceeding brought by the City. Code of Civil Procedure section 1250.360 sets forth the grounds for objection to a public entity's right to take. Among other bases for opposing condemnation, the statute provides that an owner may object on "[a]ny other ground provided by law." (Code Civ. Proc., § 1250.360, subd. (h).) The comment of

## VI

There is no merit to the City's contention that in granting Great Oaks' motion for summary judgment and dismissing the City's condemnation action on grounds of inadequacy of the EIR, the trial court "overlooked or ignored material issues of fact." Great Oaks submitted a "Statement of Material Facts Not in Dispute" which contained a statement that the EIR adopted by the City for the Edenvale Area project did not address the impact on the underground water supply, in terms of risks of depletion or contamination, of the City's provision of water service through a supply system involving new wells, storage and distribution facilities. In support of this statement, Great Oaks cited attached portions of the EIR itself. The City failed to file or submit any separate statement responding to the material facts contended by Great Oaks to be undisputed. Under Code of Civil Procedure section 437c, subdivision (b), the City's failure to file a separate statement responding to the material facts contended by Great Oaks to be undisputed constituted a sufficient ground for the trial court's granting of Great Oaks' motion for summary judgment.

Although the City did submit a declaration by a city water systems engineer stating his "professional opinion that the project ... exposes no discernable risk of either overdraft of subterranean aquifers or redirection of contamination in these aquifers," no supporting evidence was cited or submitted for this statement. Moreover, this statement by itself does not dispute the actual contention of Great Oaks, which was simply that the *EIR* itself did not address the possible impacts of the City's new wells. Thus, the

the Assembly Legislative Committee on this provision states that it was intended to allow grounds for objection not included in the 1976 Eminent Domain Law, but found in federal, constitutional, or other statutory sources. (Legis. Com. com., 19 West's Ann. Code. Civ. Proc. (1982 ed.) § 1250.360, pp. 670-671.) The California Law Revision Commission stated in its recommendation regarding the forthcoming revision of the eminent domain law that "environmental statements and hearings" are as much requirements for public projects as any prerequisites to condemnation specified in the eminent domain law itself, and that the latter should be viewed only as *supplemental* to all other prerequisites to condemnation imposed by law, including environmental laws and statutes. (Tent. Recommendation Relating to Condemnation Law and Procedure: The Eminent Domain Law, 12 Cal. Law Revision Com. Rep. (1974) pp. 97-98.) Numerous commentators have concluded that at least since enactment of the 1976 Eminent Domain Law, compliance with CEQA is a precondition of the institution of eminent domain proceedings. (Note, *California Environmental Quality Act and Eminent Domain: Failure to Comply with CEQA as a Defense to Condemnation* (1975) 8 Loyola L.A. L.Rev. 734, 747-753; Condemnation Practice in Cal. (Cont. Ed.Bar 1973) § 6.23, pp. 138-139.) Statements in the legislative record at the time of passage of the 1976 Eminent Domain Law confirm that the Legislature specifically intended that any environmental review required by CEQA or other statutes be included among the prerequisites to condemnation proceedings for public projects. (3 Assem. J. (1975 Reg. Sess.) p. 5190; 4 Sen. J. (1975 Reg. Sess.) p. 6539.)

professional opinion of the City's water engineer about the effect of those wells—whether or not that opinion was supported by any evidence at all—was simply immaterial to the issue of the adequacy of the EIR.

In any event, the fact is that the original EIR did not address the question of the impact of the City's three new wells on the underground water supply and the threat of toxic contamination thereof; neither did any subsequent EIR address this issue. There is simply no evidence in the record that contradicts or disputes these facts. There was thus no material issue of fact on this question to prevent the trial court from granting the motion for summary judgment.

## VII

The City asserts that the trial court's ruling ignored the "special" status of the instant redevelopment project under CEQA. The assertion is meritless.

Although CEQA and its implementing regulations provide that "all public and private activities or undertakings pursuant to or in furtherance of a redevelopment plan shall be deemed a single project" and that no subsequent EIRs are required for individual components of such a redevelopment plan (Pub. Resources Code, § 21090; Cal. Admin. Code, tit. 14, § 15180 subd. (b)), a specific exception is made for situations where a subsequent or supplemental EIR would be required under section 15162 or 15163 of the Administrative Code. As already discussed, that is precisely the situation presented by the facts of this case, in which a change in the project subsequent to the preparation of the original EIR creates the possibility of new significant environmental impacts not considered in any previous EIR. (Cal. Admin. Code, tit. 14, § 15162, subd. (a)(1).)

## VIII

The City argues that the trial court abused its discretion by denying the City's request for a conditional dismissal. The contention, for which absolutely no authority is cited, is completely meritless. Conditional dismissal may be granted under Code of Civil Procedure section 1260.120, subdivision (c)(2); however, it is within the sound discretion of the trial court to grant or deny a request for such conditional dismissal. Although the question of prejudice to the party seeking dismissal is relevant, a determination of that question is not conclusive on the issue of whether dismissal

should be made conditional. The City has failed to show that the trial court's refusal to make its dismissal conditional in this case amounted to an abuse of discretion.

## IX

█ Finally, the City contends that the trial court abused its discretion in awarding attorney's fees to Great Oaks. The City's contention is based primarily on the assertion that the fees billed by a different law firm which was not counsel of record in the instant action cannot be awarded herein.

The record indicates that the fees in question were actually incurred in connection with both this condemnation action and the PUC valuation proceeding initiated by the City in conjunction with the instant eminent domain action. As shown by documents and declarations in the record, any fees attributable to the PUC proceeding were necessitated solely by the City's filing of the instant condemnation action, which was unconditionally dismissed by the trial court.

Under Code of Civil Procedure section 1268.610, the trial court in an eminent domain proceeding "shall award the defendant his litigation expenses whenever: [¶] (1) The proceeding is wholly or partly dismissed for any reason ...." Section 1235.140 of the Code of Civil Procedure defines "litigation expenses" as including both "[a]ll expenses reasonably and necessarily incurred in the proceeding in preparing for trial, during trial, and in any subsequent judicial proceedings," and "[r]easonable attorney's fees, appraisal fees, and fees for the services of other experts where such fees were reasonably and necessarily incurred to protect the defendant's interest in the proceeding in preparing for trial, during trial, and in any subsequent judicial proceedings whether such fees were incurred for services rendered before or after the filing of the complaint." Under these statutes, the fees incurred by Great Oaks in connection with the companion PUC valuation proceeding constitute legitimate litigation expenses. We conclude that the trial court did not err in including these fees in its award to Great Oaks.

We note that Great Oaks conceded below that certain amounts included in its request for attorney's fees were not proper and should not be awarded. The trial court nevertheless did award these particular fees, which amount to $206.50. We therefore modify the judgment solely to delete this amount from the total attorney's fees awarded to Great Oaks by the trial court.

The judgment is modified to subtract $206.50 from the amount awarded to Great Oaks as attorney's fees. In all other respects, the judgment is affirmed.

Barry-Deal, J., and Merrill, J., concurred.