Opinion
 

 LILLIE, P. J.
 

 Burbank-Glendale-Pasadena Airport Authority (Authority) appeals from judgment (1) granting Robert R. Hensler’s motion for peremptory writ of mandate for violation of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq., hereinafter CEQA) asserted in connection with Hensler’s cross-complaint for writ of mandate for violations of CEQA, in Authority’s action in eminent domain, and (2) dismissing Authority’s action in eminent domain on the ground that Authority’s Resolution No. 224 declaring the necessity to condemn Hensler’s real property was null and void for failure to comply with CEQA.
 

 Authority contends on this appeal that a writ was inappropriate under the instant circumstances in that Hensler’s CEQA challenge “should have proceeded as a right to take trial under the eminent domain law”; the trial court’s findings of fact were not supported by substantial evidence; Authority fully complied with CEQA before instituting the eminent domain action; and even had there been lack of CEQA compliance, the trial court abused its discretion in failing to allow the condemnation to proceed.
 

 Factual and Procedural Background
 

 A.
 
 Administrative Proceedings.
 

 Since 1949, Hensler has owned a 1.4-acre parcel of land on Wheatland Avenue in the City of Los Angeles immediately west of and adjacent to the Burbank-Glendale-Pasadena Airport; the entire Hensler property lies within 750 feet of Runway 15/33; adjacent to the property on the north and south are industrial sites.
 

 Since 1949, the property has been zoned Ml under the zoning and planning laws of the City of Los Angeles; on the property, Hensler has conducted his construction business and uses the majority of the property for secure outdoor storage of heavy construction equipment; the entire perimeter of the property is secured by a chain link fence; the four structures on the property include a seven-room office building and warehouse, an equipment shop, a storage garage, and a tire storage building.
 

 
 *353
 
 Authority acquired the airport facility from Lockheed Corporation in 1978; in the vicinity of the airport is dense residential development. On April 1, 1985, Authority adopted Resolution No. 168, approving a negative declaration for a Taxi way B extension project. Taxiway B serves Runway 15/33, which runs north-south. Taxiway B lies about 335 feet to the west of and parallel to a portion of Runway 15/33, but does not extend all the way to the north end of Runway 15/33; Taxiway B presently ends about 350 feet south of Hensler’s property, but a present service road west of Taxiway B continues to the northern end of Runway 15/33 and passes close to the boundary of Hensler’s property.
 

 According to Resolution No. 168, the Authority wanted to extend Taxiway B from its existing termination point to the north end of Runway 15/33; such extension would improve aircraft operating safety by eliminating the need for pilots to request air traffic control approval to cross the active runway to Taxiway A, lying to the east of Runway 15/33, in order to continue to taxi to the north end of Runway 15/33; the extension would facilitate the use of the full runway length for departures, causing the noise level in the off-airport community to be reduced; in an initial study, the Authority determined the Taxiway B extension would cause no significant impact on the environment except for changes to the water absorption and runoff characteristics on the project site, which could be mitigated through project engineering.
 

 As to the location of the project, the negative declaration stated that “attached maps depict the project location and construction anticipated.” The maps in our record are not detailed, or of sufficient quality, for us to determine whether they depict any construction on Hensler’s property; the February 8, 1985, environmental information form, part of the initial study, states that “Generally, the project will entail converting partially undeveloped land on the airport property to paved taxiway usage,” and the “project site lies within the secured perimeter of the airfield.” The notice of determination filed in the office of the county clerk on April 1, 1985, states that the Authority had approved a project involving construction of an extension to Taxiway B in the northwest portion of the Burbank-Glendale-Pasadena Airport; the Authority determined that the project will not have a significant effect on the environment; a negative declaration was prepared for the project pursuant to the provisions of CEQA, and an appropriate mitigation measure was made a condition of the approval of the project.
 

 By Resolution No. 224, dated September 18,1989, the commission of the Authority declared the necessity to condemn Hensler’s property for the “safe and efficient operation of the Burbank Airport.” A written staff briefing
 
 *354
 
 paper presented to the Authority’s board of commissioners prior to the September 18, 1989, hearing on Resolution No. 224 stated that “For sometime [s/c] the Authority has identified completion of Taxiway B to the threshold of Runway 15 as a high priority safety project. . . . The acquisition of the Hensler property (see attached map), which lies directly in the path of the proposed taxiway, is necessary for the completion of the Taxiway B project. The property also lies within the 750 feet building restriction line and should be acquired as part of the Authority’s covenant with the FAA to acquire clear zones. [1] The completion of the taxiway requires use of approximately one. third of the easterly end of the Hensler property. It must be emphasized that the current taxiway and the proposed extension are closer to the runway than permitted by existing FAA standards. Construction of a new taxiway with proper separation from the runway is a future project that would require use of over half of the Hensler property. In any respect, the entire Hensler property lies within the 750 feet building restriction line. The FAA has agreed to provide a federal grant to complete the taxiway project, and will defray 80% of the land acquisition costs. . . . [$] Without the land acquisition, the taxiway cannot be completed. The future General Aviation development of C-l will only add to the existing problem by increasing the number of aircraft that would cross Runway 15 for full length departures to the south.”
 

 According to the transcript of a tape recording of a presentation to the Authority commission on September 18, 1989, by Mr. Marrero, the Authority’s controller, it was pointed out to the commissioners by Marrero that “it is very important the Commission understand that this is an extension of a taxiway which we eventually hope to relocate; so, we have got two projects here. One is a temporary taxiway, and, then, there is a permanent taxiway which is an extension of that taxiway further west, that those two projects, if we simply build them for the minimum FAA standards, require acquisition of around 43 to 44 percent of Mr. Hensler’s property. The critical part of this whole process, however, is the fact that the FAA also has a 750 feet building restriction line. That is standard for construction of facilities on airports and the intent of that is to have no structures within 750 feet on either side of the centerline of a runway. . . . [W]e need to acquire that property in order to build the taxiway and again there is a temporary and a permanent taxiway, and we would like to acquire the entire property in order to meet FAA standards for building set backs from the centerlines of runways, [¶] . . . [Tjhere is a clear need to extend that taxiway and ... we don’t have any alternatives to extending that taxi way through Mr. Hensler’s property.”
 

 A large photograph presented to the commission before it adopted Resolution No. 224 depicted a “temporary Taxiway B” project in which the actual
 
 *355
 
 taxiway would cut across a very small portion of the northeast corner of the Hensler property, but the service road to the west of the taxiway would cross at a slight angle to the left through the eastern third of the Hensler property. The photograph also showed a “permanent location of service road” and “permanent Taxiway B”; the “permanent Taxiway B” depicts a Taxiway B that would be widened or shifted further west through the Hensler property and a permanent service road which would run through the middle portion of the Hensler property.
 

 There is no indication on the record before us that the commission, in connection with the adoption of Resolution No. 224, considered the issue of CEQA compliance.
 

 B.
 
 Trial Court Proceedings.
 

 On October 31,1989, Authority filed complaint in eminent domain against Hensler, seeking a “total taking” of the property on Wheatland Avenue. On February 21, 1990, Hensler answered the complaint and asserted the affirmative defense, inter alia, that Authority had not complied with the provisions of CEQA; Hensler also filed a three-count cross-complaint for “(1) writ of mandate (Code Civ. Proc., § 1085) for violations of CEQA; (2) declaratory relief; and (3) preliminary and permanent injunction.”
 

 Hensler’s cross-complaint alleged that Authority “failed to support the decision to adopt Resolution No. 224 declaring the necessity to condemn [his] real property with any findings whatsoever relating to the environmental impacts which might result from the condemnation of cross-complainant’s real property or to address the feasibility of mitigation measures or environmentally superior project alternatives.” The cross-complaint also alleged that the February 1985 negative declaration was inadequate to provide the required environmental assessment for the proposed condemnation for several reasons, including, inter alia: the negative declaration did not adequately describe the project to be undertaken with plans, specifications, or factual findings as to the exact location and design of the Taxiway B extension; and it addressed a substantially different project which did not contemplate the expansion of the airfield property.
 

 After extensive argument at the hearing on Hensler’s motion for peremptory writ of mandate and preliminary injunction, the court issued an eight-page order on submitted matter on May 17, 1990, in which the court announced its decision. Pertinent portions of that lengthy decision state: “1. Resolution No. 224, here under attack, defines the ‘Project’ involved simply as ‘the safe and efficient operation of the Burbank Airport.’ This
 
 *356
 
 phrase obviously means little or nothing in isolation, but review of the staff reports . . . and the transcript of the proceedings before the Airport Authority which led to the adoption of Resolution No. 224 . . . establish beyond any doubt that three ‘projects’ for the Hensler property were approved by the Airport Authority. One was the construction of the ‘temporary taxiway’ and service road, another was the future construction of a ‘permanent taxiway’ and service road farther west, and a third was acquisition of the whole property in order to obtain a clear zone back to the ‘Building Restriction Line’ at the site of the Hensler property. . . . [¶] 2. It is conceded that the Airport Authority took no action to comply with the requirements of CEQA specifically in connection with the adoption of Resolution 224. ... Instead, the Airport Authority relied for CEQA compliance on a negative declaration prepared in 1985 with respect to a more limited proposal for a narrower extension of taxiway B which lacked an adjacent service road and which was contained totally within the preexisting secured perimeter of the airport. It is clear that the 1985 project is not the same as either the ‘temporary’ or ‘permanent’ taxiway projects which provided the rationale for Resolution 224. ... In the ‘permanent’ taxiway project, the taxiway would pass about through the middle of the Hensler property, as compared to not touching it in the 1985 proposal. The clear zone acquisition would move the western boundary of the airport several hundred feet to the west. The environmental impact of simple acquisition might not be such as to implicate CEQA, but whether the property would remain unused or be dedicated to airport operations remains an unanswered question. If the area were used for airport operations, those operations would then be several hundred feet closer to the residential area to the west. ... [¶] There has been no evaluation of the potential environmental consequences of changes the projects might cause in noise, exhaust, emissions, lights, dust, drainage problems, accident or explosion hazards, traffic volume, contamination hazards, etc., or the effect of moving these hazards and effects closer to the residential area to the west. ...[¶] There is more than substantial evidence in the record indicating the potential for environmental consequences different from, either qualitatively or quantitatively, those contemplated by the negative declaration prepared for the 1985 project.”
 

 In response to Authority’s argument to the trial court that equitable considerations authorize the court to permit it to proceed with the condemnation notwithstanding lack of CEQA compliance, pursuant to
 
 Laurel Heights Improvement Assn.
 
 v.
 
 Regents of University of California
 
 (1988) 47 Cal.3d 376 [253 Cal.Rptr. 426, 764 P.2d 278], the court concluded in its May 17, 1990 order that the
 
 Laurel Heights
 
 “analogy is not apt” for several reasons, including the
 
 fact that the
 
 issue in
 
 Laurel Heights
 
 was the adequacy
 
 *357
 
 of the environmental impact report’s evaluation of anticipated future uses as opposed to the lack of an initial environmental assessment of the project in the first instance.
 

 The trial court also rejected the Authority’s procedural argument that the issue of CEQA compliance is not properly raised by or addressed within a petition for writ of mandate, but should be addressed as an objection to the right to take in an eminent domain trial. The court’s order stated that “In circumstances other than eminent domain, review of CEQA compliance is normally accomplished by a writ of mandate trial. In the absence of citation of any authority actually prohibiting mandate procedures in this case, the court concludes that petitioner is entitled to have his petition for writ of mandate heard and ruled upon.”
 

 A June 12, 1990, “Judgment and Order Re Dismissal” granted Hensler’s motion for peremptory writ of mandate, dismissed the eminent domain action, and also declared Resolution No. 224 null and void, ordering that Authority take no further action in reliance on Resolution No. 224. Filed on November 27,1990, was a peremptory writ of mandate and order signed by the court on June 12, 1990. The peremptory writ of mandate commanded the Authority to vacate and set aside Resolution No. 224 and to take no further action in reliance upon it. Authority appealed from “the judgment entered by the court on or about June 13, 1990.”
 

 I
 

 Standard of Review and Procedural Contentions
 

 Appellant challenges the propriety of the trial court’s resolution of the CEQA issue on the cross-complaint in a “summary hearing” rather than as an objection to the right to take in a “full evidentiary trial” in the eminent domain action. It argues that such a procedure “deprived the Authority of a full trial on the issue of the right to take, improperly shifted the burden of proof from respondent to the Authority, and enabled respondent to proceed without regard to the eminent domain law.” It also claims it was deprived of the ability to present “all live evidence via live testimony.” We address first the issue of the procedural vehicle(s) by which Hensler raised his CEQA challenges.
 

 Appellant claims it “does not contend that a failure to comply with CEQA cannot be raised as a defense when eminent domain proceedings are started.” In the instant case, Hensler raised the lack of CEQA compliance by affirmative defense in his answer to the complaint in eminent domain and also by
 
 *358
 
 way of cross-complaint for petition for writ of mandate. Appellant also appears to acknowledge the applicability of language in
 
 City of San Jose
 
 v.
 
 Great Oaks Water Co.
 
 (1987) 192 Cal.App.3d 1005 [237 Cal.Rptr. 845] to the instant case. That case held that the trial court did not err in dismissing the city’s eminent domain proceedings on the ground that the city violated CEQA by failing to make a determination whether a subsequent or supplemental EIR was required by the redesign of a project for a water service system. (192 Cal.App.3d at p. 1017.)
 
 [1]
 

 Appellant has failed to cite any pertinent authority to establish that either Hensler’s affirmative defense in the answer or his cross-complaint was an inappropriate vehicle by which to raise the CEQA claims.
 

 Further, appellant fails to cite any pertinent authority to support its claim that the function of the reviewing courts in evaluating the CEQA defense would somehow be different, whether the CEQA issue is raised by way of affirmative defense in an answer or by way of cross-complaint for petition
 
 *359
 
 for writ of mandate. Whether appellant’s actions challenged herein were undertaken in a traditional mandamus proceeding where judicial review under CEQA is governed by Public Resources Code section 21168.5, or in an administrative mandamus proceeding where such review is governed by Public Resources Code section 21168, “the standard of review is essentially the same under either section, i.e., whether substantial evidence supports the agency’s determination.”
 
 (Laurel Heights Improvement Assn.
 
 v.
 
 Regents of University of California, supra,
 
 47 Cal.3d 376, 392, fn. 5.)
 

 A “prejudicial abuse of discretion” under Public Resources Code section 21168.5 is established “if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.” (Pub. Resources Code, § 21168.5.)
 

 Because the adoption of a resolution of necessity by a condemning agency or legislative body is a prerequisite to the filing of a complaint in eminent domain (Code Civ. Proc., §§ 1240.040, 1245.220;
 
 Anaheim Redevelopment Agency
 
 v.
 
 Dusek
 
 (1987) 193 Cal.App.3d 249, 252, fn. 2 [239 Cal.Rptr. 319]), a successful CEQA challenge to the adoption of a resolution of necessity would also constitute a defense to an eminent domain proceeding. Accordingly, Hensler’s affirmative defense based on CEQA and his cross-complaint can also be viewed as attacks on the validity of the resolution of necessity.
 

 Although judicial review of the validity of a resolution of necessity may be obtained before the commencement of the eminent domain proceeding by petition for a writ of mandate pursuant to Code of Civil Procedure section 1085, and after the commencement of the eminent domain action by objection to the right to take (Code Civ. Proc., § 1245.255, subd. (a)), it has been held that under either procedural vehicle, the trial court would apply a section 1085 deferential standard of review. (See
 
 Anaheim Redevelopment Agency
 
 v.
 
 Dusek, supra,
 
 193 Cal.App.3d at pp. 258, 264.)
 

 “ ‘Judicial review of the resolution of necessity by ordinary mandamus on the ground of abuse of discretion is limited to an examination of the proceedings to determine whether adoption of the resolution by the governing body of the public entity has been arbitrary, capricious, or entirely lacking in evidentiary support, and whether the governing body has failed to follow the procedure and give the notice required by law.’ ”
 
 (Anaheim Redevelopment Agency
 
 v.
 
 Dusek, supra,
 
 193 Cal.App.3d 249, 257.)
 
 [2]
 

 
 *360
 
 While asserting that the appropriate standard of review in this case is set out in the
 
 Laurel Heights
 
 case, appellant incongruously maintains that it was entitled to a “full evidentiary trial,” that the trial court misallocated the “burden of proof,” and its findings were not supported by substantial evidence. However, the standard of review under Public Resources Code sections 21168 and 21168.5 does not permit the reviewing court to make its own factual findings.
 

 Moreover, appellant fails to establish that the trial court failed to apply the appropriate standard of review, or that respondent failed to bring up in the trial court an appropriate administrative record for review. To the extent that appellant’s complaint that it was deprived of the right to a full evidentiary trial is an indirect complaint that the administrative record is incomplete, we find such argument to be without merit. Appellant fails to substantiate any implied charge that the administrative record is incomplete; even if incomplete, appellant had ample opportunity to ensure that the appropriate record was brought before the trial court.
 

 Appellant’s claim that it was “deprived of a full trial on the issue of the right to take,” is also inconsistent with its concession that a failure to comply with CEQA is an objection to the right to take and can be raised as a defense to an eminent domain action. Moreover, the Eminent Domain Law provides that unless the court orders otherwise, objections to the right to take shall be heard and determined prior to the determination of the issue of compensation. (Code Civ. Proc., § 1260.110, subd. (a).)
 

 Furthermore, appellant fails to explain what “live testimony” it would have offered on the issue of CEQA compliance, given the existence of an adequate administrative record on the issue. To the extent that appellant seeks to offer extrinsic evidence of the commissioners’ or staff members’ personal opinions or understanding of the project, they may not be employed by us in determining the meaning of Resolution No. 224. (See
 
 Terminal Plaza Corp.
 
 v.
 
 City and County of San Francisco
 
 (1986) 186 Cal.App.3d 814, 827 [230 Cal.Rptr. 875].) However, legislative discussions and events leading to the adoption of the resolution at issue are entitled to consideration
 
 (id.,
 
 at p. 828, fn. 9), and there is no assertion herein that our record is incomplete as to such evidence.
 

 To the extent that appellant relies upon the trial court’s eight-page order on submitted matter of May 17, 1990, as evidence that the trial court
 
 *361
 
 improperly made independent findings of fact or applied an improper standard of review, we find such reliance to be misplaced. “A memorandum opinion is not a decision. Although it may purport to decide issues in the case, it is merely an informal statement of the views of the trial judge. It does not constitute findings of fact.”
 
 (Taormino
 
 v.
 
 Denny
 
 (1970) 1 Cal.3d 679, 684 [83 Cal.Rptr. 359, 463 P.2d 711].) There are instances where a court’s comments may be valuable in illustrating the trial judge’s theory but they may never be used to impeach the order or judgment.
 
 (In re Marriage of Ditto
 
 (1988) 206 Cal.App.3d 643, 646 [253 Cal.Rptr. 770].)
 

 Even were we to deem the May 17, 1990, order to be a statement of decision in which the trial court placed on the record its view of the law of the case, we find nothing therein to establish the trial court did not apply the proper standard of review. We thus proceed to discuss the issue of whether the Authority “proceeded in a manner required by law” (Pub. Resources Code, § 21168.5) in adopting Resolution No. 224.
 

 II
 

 CEQA Compliance
 

 “[I]n CEQA, the Legislature sought to protect the environment by the establishment of administrative procedures drafted to [e]nsure that the long-term protection of the environment shall be the guiding criterion in public decisions. (Pub. Resources Code, § 21001, subd. (d).) To achieve these objectives, CEQA and the guidelines issued by the State Resources Agency to implement CEQA establish a three-tiered structure. If a project falls within a category exempt by administrative regulation . . . , or it can be seen with certainty that the activity in question will not have a significant effect on the environment, ... no further agency evaluation is required. If there is a possibility that the project may have a significant effect, the agency undertakes an initial threshold study . . . ; if that study demonstrates that the project will not have a significant effect, the agency may so declare in a brief Negative Declaration. ... If the project is one which may have a significant effect on the environment, an EIR [environmental impact report] is required.”
 
 (East Peninsula Ed. Council, Inc.
 
 v.
 
 Palos Verdes Peninsula Unified School Dist.
 
 (1989) 210 Cal.App.3d 155, 163-164 [258 Cal.Rptr. 147], internal quotation marks omitted.)
 

 “If an activity is a project as defined by CEQA and not otherwise exempt from CEQA, the agency must conduct an initial study to determine whether the project may have a significant effect on the environment.”
 
 (Schaeffer Land Trust
 
 v.
 
 San Jose City Council
 
 (1989) 215 Cal.App.3d 612,
 
 *362
 
 620 [263 Cal.Rptr. 813].) The task of the reviewing court is not to question the wisdom of proceeding with a project, or to pass upon the correctness of a public entity’s conclusions, but only upon the sufficiency of an EIR or negative declaration as an informative document.
 
 (Ibid.)
 
 “In reviewing whether agency procedures comply with CEQA, the test to be applied is ‘whether an objective, good faith effort to so comply is demonstrated.’ [Citation.] The completion of a proper initial study is relevant to whether the agency made a ‘good faith effort’ to comply with the Act.”
 
 (Sundstrom
 
 v.
 
 County of Mendocino
 
 (1988) 202 Cal.App.3d 296, 305 [248 Cal.Rptr. 352].)
 

 CEQA mandates that environmental considerations not become submerged by chopping a large project into many little ones, each with a potential impact on the environment, which cumulatively may have disastrous consequences.
 
 (City of Santee
 
 v.
 
 County of San Diego
 
 (1989) 214 Cal.App.3d 1438, 1452 [263 Cal.Rptr. 340].) CEQA attempts to avoid this result by defining the term “project” broadly.
 
 (Ibid.)
 
 A project under CEQA is the whole of an action which has a potential for resulting in a physical change in the environment, directly or ultimately, and includes the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies.
 
 (McQueen
 
 v.
 
 Board of Directors
 
 (1988) 202 Cal.App.3d 1136, 1143 [249 Cal.Rptr. 439].)
 

 “An accurate project description is necessary for an intelligent evaluation of the potential environmental effects of a proposed activity.”
 
 (McQueen
 
 v.
 
 Board of Directors, supra,
 
 202 Cal.App.3d at p. 1143.) A narrow view of a project could result in the fallacy of division, that is, overlooking its cumulative impact by separately focusing on isolated parts of the whole.
 
 (Id.,
 
 at p. 1144.)
 

 An accurate, stable and finite project description is the sine qua non of an informative and legally sufficient EIR; the defined project and not some different project must be the EIR’s bona fide subject.
 
 (Mira Monte Homeowners Assn.
 
 v.
 
 County of Ventura
 
 (1985) 165 Cal.App.3d 357, 365 [212 Cal.Rptr. 127].) “CEQA compels an interactive process of assessment of environmental impacts and responsive project modification which must be genuine. It must be open to the public, premised upon a full and meaningful disclosure of the scope, purposes, and effect of a consistently described project, with flexibility to respond to unforeseen insights that emerge from the process.”
 
 (Id.,
 
 at p. 366, internal quotation marks omitted.)
 

 Whether the project contemplated in 1985 was substantially the same one as contemplated in 1989, appellant apparently concedes that both
 
 *363
 
 projects are subject to CEQA. Appellant contends that the negative declaration prepared in 1985 constitutes compliance with CEQA because the taxiway/service road project described in the 1985 initial study is the same project approved in 1989; that the “only new fact in 1990 was that the negotiations to purchase respondent’s property had reached an impasse, necessitating exercise of the power of eminent domain to accomplish the always-anticipated acquisition of the Hensler property.” Appellant also speculates, without any evidence in the record, that the author of the 1985 study, “apparently assuming that the negotiations to acquire Hensler’s property would promptly be completed, stated that ‘the project site lies within the secured perimeter of the airfield.’ ”
 

 Appellant acknowledges that the latter statement about the location of the project is “obviously erroneous,” but argues that “there is no evidence that the error misled the Authority when it approved the Negative Declaration,” and that Hensler and the public were not misled because a public invitation to comment was issued and any interested person would have been able to examine a map attached to the initial study showing the project area extending onto the eastern edge of Hensler’s property.
 

 There is no evidence that the author(s) of the 1984-1985 environmental documents made mistakes in describing the location of the project or were making assumptions about the future acquisition of Hensler’s property. The 1985 documents, including a general map, simply describe a different project than the project which was described to the Authority’s commissioners in 1989. The 1989 project involved the acquisition of Hensler’s property, an expansion of the size of the airport’s property, and a reasonably foreseeable expansion of airport operations farther to the west and closer to neighboring residential areas. The 1989 project also was anticipated to have an impact on the contemplated development of other portions of the airport. A 1989 staff report prepared in connection with adoption of Resolution No. 224 noted that the contemplated future development of a parcel of land identified as C-l, which the Authority was attempting to purchase, “will only add to the existing problem by increasing the number of aircraft that would cross Runway 15 for full-length departures to the south.”
 
 [3]
 

 
 *364
 
 We find to be without merit appellant’s argument that the only change in the project from 1985 to 1989 was the Authority’s anticipated acquisition of Hensler’s property by condemnation and that such a change constitutes a mere change in ownership, which does not require environmental review under CEQA. We find no evidence in our record that the commissioners deemed the 1985 project to have substantially the same environmental effects as the 1989 project, and that the only change in 1989 was Authority’s condemnation of the Hensler property. In fact, there is no indication that the commissioners in 1989 even considered the 1985 environmental documents or indeed any issue pertaining to CEQA in connection with their adoption of Resolution No. 224. There is certainly no indication in our record that the commissioners determined that the 1985 negative declaration could or should apply to the project which was the basis of Resolution No. 224.
 

 Accordingly, the procedure followed by appellant violated section 15004, subdivision (b)(1) of title 14 of the California Code of Regulations (hereinafter referred to as Guidelines), which provides that “With public projects, at the earliest feasible time, project sponsors shall incorporate environmental considerations into project conceptualization, design, and planning. CEQA compliance should be completed prior to acquisition of a site for a public project.”
 

 We can only conclude on our record that the project which was the subject of the 1985 negative declaration was a substantially different project than the one which was the basis of Resolution No. 224. Because there is no evidence that the Authority, in adopting Resolution No. 224, ever conducted a threshold initial study under CEQA, or considered the issue of whether an additional environmental document needed to be prepared due to subsequent changes in the project (see Guidelines, § 15162), these issues are ones, among others raised by appellant, which should be addressed by the Authority in the first instance—i.e. before granting any approval of a project subject to CEQA-—rather than by the trial court or this court. (Guidelines, § 15004, subd. (a); see also
 
 Vollstedt
 
 v.
 
 City of Stockton
 
 (1990) 220 Cal.App.3d 265, 279 [269 Cal.Rptr. 404];
 
 Burlington Truck Lines
 
 v.
 
 U. S.
 
 (1962) 371 U.S. 156, 169 [9 L.Ed.2d 207, 216, 83 S.Ct. 239].) If this court were to address the merits of such issues, we would be engaging in post-approval environmental review; CEQA would become nothing more than
 
 post hoc
 
 rationalizations to support actions already taken.
 
 (City of Santee
 
 v.
 
 County of San Diego, supra,
 
 214 Cal.App.3d 1438, 1451.)
 

 
 *365
 
 III
 

 Dismissal Was Proper Remedy for CEQA Violation
 

 Appellant contends that even if there was a CEQA violation, the trial court abused its discretion in dismissing the eminent domain action. It argues that “even if the lower court correctly concluded that the 1985 negative declaration was insufficient to support condemnation of the part of the Hensler property not necessary to the taxiway/service road project, the lower court was not obliged and should not have preempted the completion of that project when significant safety considerations support it and no adverse environmental impacts would result from it.”
 

 As noted by the trial court, Authority’s reliance on
 
 Laurel Heights Improvement Assn.
 
 v.
 
 Regents of University of California, supra,
 
 47 Cal.3d 376, is misplaced. In
 
 Laurel Heights,
 
 the court found that the EIR for the relocation of a biomedical research facility to a building the Regents had already purchased was invalid because it failed to discuss the anticipated future uses of the facility and project alternatives, and that a new EIR must be prepared in accord with CEQA procedures
 
 (id.,
 
 at p. 388); however, the court declined to order the present activities at the new location stayed pending certification of a new EIR because there was substantial evidence to support the Regents’ finding that the environmental effects of the present activities will be mitigated and there was no evidence the environment was being adversely affected by the present activities. (47 Cal.3d at p. 424.)
 

 In considering the equities of the case, the court in
 
 Laurel Heights
 
 stated: “Requiring the University to cease existing laboratory operations at the Laurel Heights facility and to move them to other sites would cause unnecessary cost that would ultimately be borne by the taxpayers. More important, such an order would seriously disrupt ongoing scientific research and perhaps cause the University to lose important faculty members and research funds.” (47 Cal.3d at p. 424.)
 

 The court in
 
 Laurel Heights
 
 also cautioned that “neither the present activity we are allowing to continue nor any prior UCSF activities involving Laurel Heights . . . can serve as a proper basis for rejecting feasible alternatives to the Laurel Heights site. We shall not countenance any attempt to reject an alternative on the ground that the Laurel Heights site has already been purchased or that activities there have already commenced. The Regents must begin anew the analytical process required under CEQA. We will not accept
 
 post hoc
 
 rationalizations for actions already taken, particularly in light of tiie fact that those activities were begun in violation of CEQA, even
 
 *366
 
 if done so in good faith. To do so would tarnish the integrity of the decision making process required by CEQA.” (47 Cal.3d at p. 425.)
 
 [4]
 

 Unlike the university in
 
 Laurel Heights,
 
 appellant has not conducted any environmental review in connection with the project which formed the basis of Resolution No. 224, so this court is not in any position to evaluate the environmental consequences of proceeding with the project. Further, appellant has not yet begun any activities on Hensler’s property. Appellant fails to bring to our attention any equitable considerations which justify an order permitting it to proceed with the eminent domain action under the circumstances of this case. On the other hand, there are many equitable concerns which militate against the disposition propounded by appellant, which disposition would constitute an affront to the integrity of the decisionmaking process required by CEQA.
 

 One of the basic purposes of CEQA is to inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. (Guidelines, § 15002, subd. (a)(1).) “ ‘The EIR process protects not only the environment but also informed self-government.’ ”
 
 (City of Santee
 
 v.
 
 County of San Diego, supra,
 
 214 Cal.App.3d at p. 1450.) As stated in Guidelines section 15200, “The purposes of review of EIR’s and negative declarations include: [¶] (a) Sharing expertise, [¶] (b) Disclosing agency analyses, [¶] (c) Checking for accuracy, [¶] (d) Detecting omissions, [¶] (e) Discovering public concerns, and [¶] (f) Soliciting counter proposals.” Guidelines section 15201 provides that “Public participation is an essential part of the CEQA process.”
 

 In the instant case, neither the Authority’s commissioners nor the public were informed about the environmental effects, or lack thereof, of the project which was the basis of Resolution No. 224. The public has not yet had an opportunity to review such project. Moreover, Guidelines section 15004, subdivision (b)(1) states that “CEQA compliance should be completed prior to acquisition of a site for a public project.”
 

 Accordingly, we conclude the trial court did not abuse its discretion in dismissing the eminent domain action. We also find insufficient grounds to permit Authority to proceed without CEQA compliance, in direct contravention of Guidelines section 15004, subdivision (b)(1).
 

 
 *367
 
 Disposition
 

 The judgment is affirmed.
 

 Johnson J., and Woods (Fred), J., concurred.
 

 [1]
 

 The court in
 
 City of San Jose
 
 elaborated: “Great Oaks’s challenge to the adequacy of the EIR was properly raised in the context of this eminent domain proceeding brought by the City. Code of Civil Procedure section 1250.360 sets forth the grounds for objection to a public entity’s right to take. Among other bases for opposing condemnation, the statute provides that an owner may object on ‘[a]ny other ground provided by law.’ (Code Civ. Proc., § 1250.360, subd. (h).) . . . Statements in the legislative record at the time of the passage of the 1976 Eminent Domain Law confirm that the Legislature specifically intended that any environmental review required by CEQA or other statutes be included among the prerequisites to condemnation proceedings for public projects. (3 Assem. J. (1975 Reg. Sess.) p. 5190; 4 Sen. J. (1975 Reg. Sess.) p. 6539.)” (192 Cal.App.3d at pp. 1017-1018, fn. 5.)
 

 The court in
 
 San Bernardino County Flood Control Dist.
 
 v.
 
 Grabowski
 
 (1988) 205 Cal.App.3d 885 [252 Cal.Rptr. 676], without acknowledging
 
 City of San Jose,
 
 stated that “The Legislative Committee Comment (Assem., 1975) makes it clear that section 1250.360, subdivision (h), is intended generally to apply to grounds which arise from other than a California statutory source (such as federal or constitutional grounds) or to grounds which are based on specific statutory condemnation prerequisites set forth in other California codes. Neither category is applicable to Grabowski’s PRA [Political Reform Act] challenge.” (205 Cal.App.3d at p. 895.)
 

 The CEQA challenge in the instant case is distinguishable from the PRA challenge in
 
 Grabowski
 
 because the CEQA challenge falls within a “specific statutory condemnation prerequisite set forth in other California codes.” Section 15004, subdivision (b)(1) of title 14 of the California Code of Regulations provides: “With public projects, at the earliest feasible time, project sponsors shall incorporate environmental considerations into project conceptualization, design and planning. CEQA compliance should be completed prior to acquisition of a site for a public project.”
 

 We also conclude that a CEQA challenge to the instant project involving Hensler’s property, which challenge, if successful, would result in the dismissal of the eminent domain action, is properly asserted by way of cross-complaint pursuant to Code of Civil Procedure section 428.10, subdivision (b). Such a claim is subject to the mandatory pleading requirements applicable to compulsory cross-complaints (Code Civ. Proc., § 426.30), which requirements section 426.70 makes specifically applicable to eminent domain proceedings. (See
 
 San Bernardino County Flood Control Dist.
 
 v.
 
 Grabowski, supra,
 
 205 Cal.App.3d 885, 896.)
 

 [2]
 

 Although not expressly raised by the parties, an interesting question arises as to whether the judicial review of an attack on the validity of Resolution No. 224 under Code of Civil Procedure section 1245.255 is more deferential than judicial review accorded under CEQA. We need not resolve that issue here because we conclude that even if review under section
 
 *360
 
 1245.255 is more deferential, Authority’s action herein does not meet even the more deferential standard of review. As explained in more detail below, in adopting Resolution No. 224, Authority failed to proceed in the manner required by CEQA.
 

 [3]
 

 In an improper attempt to impeach the evidence contained in the administrative record, appellant maintains on appeal that the Authority had then, and has now, no intention or ability to pursue development of C-l or the permanent Taxiway B project. If what appellant maintains is true, then we would be forced to conclude on this record that the Authority used an erroneous or entirely speculative project description as justification for its acquisition of Hensler’s property, but never intended to actually proceed with that project. If true, such a situation would constitute much more insidious conduct than a failure to comply with CEQA.
 
 *364
 
 “CEQA contemplates
 
 serious
 
 and not superficial or pro forma consideration of the potential environmental consequences of a project.”
 
 (Leonojf
 
 v.
 
 Monterey County BcL of Supervisors
 
 (1990) 222 Cal.App.3d 1337, 1347 [272 Cal.Rptr. 372], italics added.)
 

 [4]
 

 Appellant also relies upon
 
 City of Santee
 
 v.
 
 County of San Diego, supra,
 
 214 Cal.App.3d 1438, involving a temporary county jail expansion project. Like
 
 Laurel Heights,
 
 the court in
 
 City of Santee
 
 found the EIR to be inadequate as to future activities, but pending certification of an adequate EIR, the county was permitted to continue its present use of the jail facility. Both
 
 Laurel Heights
 
 and
 
 City of Santee
 
 are distinguishable from the circumstances herein.