Filed 10/7/15  Sacramento Citizens Concerned About Railyards v. City of Sac. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| SACRAMENTO CITIZENS CONCERNED ABOUT THE RAILYARDS et al., | C065220 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34200800000504CUWMGDS) |
| v. | |
| CITY OF SACRAMENTO et al., | |
| Defendants and Respondents; | |
| IA SACRAMENTO HOLDINGS, L.L.C., et al., | |
| Real Parties in Interest and Respondents. | |

The present appeal involves litigation over the City of Sacramento's (City) plan to develop a large parcel of land once occupied by maintenance facilities of the Southern Pacific and Union Pacific Railroads. The parcel, located near the city's downtown, major freeways, and the confluence of the American and Sacramento Rivers, has significant historic and archaeological resources but, during the course of its earlier use as a railroad

1

facility, suffered major releases of toxic substances, resulting in its listing as a state "Superfund" site. (See Health & Saf. Code, § 25300 et seq.) Remediation efforts have been underway since 1984, supervised by the state Department of Toxic Substances Control (DTSC). The remediation activities are the subject of separate environmental review.

With the cessation of railroad activity and the progress of remediation efforts, the city formulated plans for development of the site. The plan, ultimately adopted as the "Sacramento Railyards Specific Plan" (Specific Plan), contemplates development of mixed uses on the 244-acre site over a 15- to 20-year period (the Project). In addition to the strictures of the Specific Plan, development is further constrained by the "Sacramento Railyards Design Guidelines" (Design Guidelines) and two ordinances: Sacramento Ordinance No. 2007-101, the Sacramento Railyards Special Planning District Ordinance (SPD Ordinance), and Sacramento Ordinance No. 2007-103, the Central Shops Historic District Ordinance.

According to respondents, the protracted development time period, with the prospect of changing market conditions, suggested a need for flexibility in determining the precise mix of land uses and in making specific development decisions for specific parcels. For that reason, the City prepared a "tiered" or "program" environmental impact report (EIR) pursuant to the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) and its implementing regulations (CEQA Guidelines; Cal. Code Regs., tit. 14, § 15000 et seq.). (CEQA Guidelines, § 15168.) The EIR set forth a detailed environmental analysis of the Project's environmental effects where the type and timing of development had been decided. However, where future development options remained abstract or speculative, the EIR provided a programmatic level of analysis which recognized that additional environmental review would be required as specific development options were chosen in light of market conditions and other factors.

Consistent with rules governing program EIR's, if a later Project-related activity would have effects not previously examined in the EIR, a new initial study would be required, leading to either another EIR or a negative declaration. Moreover, all development in the area covered by the Specific Plan requires a subsequent discretionary urban development permit pursuant to the SPD Ordinance. Each development application will be subject to evaluation as to whether additional environmental review is required under CEQA.

In a petition for a writ of mandate against defendant City, Sacramento Citizens Concerned About the Railyards (Citizens) challenged the adequacy of CEQA review of the City's adoption of the Specific Plan and related actions. The trial court denied the petition.

On appeal, Citizens asserts five main inadequacies in the City's EIR. According to Citizens, the EIR does not adequately describe historic or archaeological resources; fails to provide adequate information regarding the Project's water quality impacts; changes the Project description; improperly segments review of the cistern, "an underground basin designed to retain the first flush drainage runoff from the Railyards site and to attenuate peak flows from storm events"; and inadequately analyzes traffic impacts and air quality impacts. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

**Railyards Specific Plan**

In the heart of downtown Sacramento sit 244 acres ripe for development. The site is north of the central business district, east of the Sacramento River and Interstate 5, south of North B Street and the Richards Boulevard area, and west of the Alkali Flat neighborhood.

In 1862, before construction of the Transcontinental Railroad began, the Sacramento Board of Supervisors granted part of the site to the Central Pacific Railroad.

3

The railroad used the land to construct and repair train cars, engines, and other equipment. The repair shops in the railyards were used until 1995.

In 1994 the ROMA Design Group prepared, and the City adopted, an initial plan for the railyards (ROMA Plan). The ROMA Plan preserved the Southern Pacific Depot and the central shops area on the site. It included 2,800 residential units, 9.6 million square feet of office space, and 500,000 square feet of retail and entertainment space.

In 2005 the developer filed an application with the City to develop a master plan for the railyards. The mixed-use plan included housing and a transportation facility.

The following year, the City issued a notice of preparation of the draft EIR (DEIR) for the Specific Plan. The plan proposed up to 11,085 mixed use, high density residential units; up to 2,986,500 square feet of office space; up to 1,370,000 square feet of retail; up to 1,000 hotel rooms; and up to 421,700 square feet for entertainment and cultural uses.

The Specific Plan established five land use designations: (1) residential/ commercial mixed use, (2) office/residential mixed use, (3) residential mixed use, (4) transportation use, and (5) open space. To provide flexibility, the Specific Plan sets forth the maximum densities for each use allowed within the first three mixed-use designations. The subsequent DEIR included an "EIR Analysis Scenario" assuming a level and mix of uses similar to the maximum development levels in the Specific Plan, on which the DEIR impact analyses were based.

In 2007 the City released the DEIR for the Specific Plan. The DEIR also served as program EIR. According to the DEIR, most of the impacts caused by the Project were less than significant or could be mitigated to a less than significant level. However, the generation of the ozone precursors $NO_x$ and ROG, temporary production of loud noise during construction, permanent exposure of sensitive receptors to traffic and rail noise levels, and traffic impacts could not be mitigated to a less than significant level. In addition, traffic impacts were severe, slowing traffic flow and congesting freeways.

Extensive commentary by various agencies and the public followed. The California Regional Water Quality Control Board, Central Valley Region (Water Quality) inquired as to the cleanup levels needed in groundwater and the vadose zone to protect inhabitants of buildings on the site. Water Quality also questioned the potential adverse impact on surface water from graded contaminated materials in storm water runoff.

Caltrans stated the Project would cause regional and interregional traffic impacts, including impacts to Interstate 5 and local roadways. Caltrans, which views the completion of the region's light rail lines as essential to a complete regional transportation system, was concerned that the Project's anticipated generation of 140,000 to 149,000 vehicle trips per day would far exceed the capacity of a fully built out light rail system. Caltrans noted the Project should provide fair share funding contributions to improve both the freeways and light rail.

The Sacramento Metropolitan Air Quality Management District (Air Quality) faulted the DEIR for suggesting the threshold of significance for toxic air contaminant (TAC)-induced cancer cases was 446 per million. Air Quality noted the district protocol does not provide an acceptable cancer risk level or regulatory threshold.

### Approval of Specific Plan and Certification of EIR

The City scheduled and publicized a 45-day comment period on the DEIR. During this period, the City held public hearings on the Specific Plan and the DEIR.

On September 11, 2007, the Sacramento City Design Commission, Preservation Commission, Planning Commission, and Development Oversight Commission held a joint meeting on the Specific Plan. A representative of the Sacramento Metropolitan Chamber of Commerce stated the Project had to be approved by the end of the year to be eligible for Proposition 1C housing bonds that were targeted for transit-friendly housing projects.

At a subsequent Sacramento City Council (City Council) public hearing on December 4, 2007, the City Council learned that the residential phases of the Specific Plan were not economically feasible.

On December 11, 2007, the City Council held a final public hearing on the Specific Plan. The council adopted a resolution certifying the EIR (consisting of the DEIR and the final EIR (FEIR)), passed an ordinance approving the "Development Agreement for Sacramento Railyards Project" (Development Agreement), adopted the Specific Plan, approved the Design Guidelines, and entered into a memorandum of understanding with DTSC and S. Thomas Enterprises for remediation of toxic substances at the railyards, along with other entitlements. The Redevelopment Agency of the City of Sacramento adopted the Project EIR and its mitigation monitoring program as the responsible agency and approved the "Sacramento Railyards Owner Participation Agreement Business Terms," which required the agency to provide an owner participation agreement containing specific provisions.

**Writ of Mandate**

Citizens filed a petition for a writ of mandate. Following oral argument, the court denied the petition. Citizens filed a timely notice of appeal.

**DISCUSSION**

**Standard of Review**

The Legislature intended CEQA to be interpreted to afford the fullest possible protection to the environment within the reasonable scope of that statute. The EIR provides the means of achieving this goal and may provide an environmental alarm bell, alerting the public and their governmental representatives to environmental changes before they become irreversible. In addition, the EIR's purpose is to provide the public with evidence that the responsible agency has analyzed and considered the ecological impacts of its action. As a document of accountability, the EIR allows the public to know the basis on which public officials approve or reject environmentally significant action.

6

Armed with this knowledge, the public can respond to official acts that impact the environment. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390-392 (*Laurel Heights*).)

When considering a challenge to the legal adequacy of an EIR, we presume an agency's decision to certify the EIR is correct, placing the burden of establishing otherwise on the party challenging the EIR. (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530 (*Sierra Club*).) We must determine whether the agency abused its discretion by not proceeding in a manner required by law or making a decision not supported by substantial evidence. We do not second-guess the correctness of the EIR's environmental conclusions, but we consider only its sufficiency as an informational document. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392.) We will not set aside an agency's approval of an EIR on the ground that a different conclusion would have been more reasonable or equally compelling. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564.)

We review the agency's decision, not that of the trial court. (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162.) When considering whether an agency followed the correct procedures, we conduct a de novo review. However, when reviewing an agency's substantive factual conclusions, we afford the agency greater deference and employ the substantial evidence test. In reviewing the record for substantial evidence we do not reweigh the evidence. Instead, we focus on the adequacy, completeness, and good faith effort at full disclosure. (*Sierra Club, supra,* 163 Cal.App.4th at p. 531; *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1390.)

**Description of Historic and Archaeological Resources**

"An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published . . . . The description of the environmental setting shall be no longer than is necessary to an understanding of the significant effects of the proposed project and its

alternatives. [¶] . . . [¶] . . . Special emphasis should be placed on environmental resources that are rare or unique to that region and would be affected by the project." (CEQA Guidelines, § 15125, subds. (a), (c).)

Citizens challenges the EIR's description of historic and archaeological resources. According to Citizens, the EIR fails to identify the route of the Transcontinental Railroad, provides inadequate information from which to establish the boundaries of the Central Shops Historic District, and fails to identify archaeological resources and respond to agency comments.

### Transcontinental Railroad

The DEIR states: "The route over the Sierra Nevada originally began by traversing the Railyards, passing in an arc to the north of where the roundhouse once stood and where the Car Machine Shop is located. . . . [¶] . . . The records search conducted for the EIR identified several recorded points of the route of the First Transcontinental Railroad located east of the Railyards . . . , but no points in the Railyards were previously recorded." In addition, "Camille Lane is proposed to be constructed in an arc-shaped footprint that generally follows the path of the First Transcontinental Railroad route as it passed through the Railyards property in Sacramento."

Citizens argues this description of the route in general terms fails to satisfy CEQA. According to Citizens, the EIR states that the location of the First Transcontinental Railroad route is known but fails to identify it. Instead, the EIR leaves the location to be determined at a later date as a mitigation measure. Citizens claims the deferral of identification of the route allows the route to be paved over and lost in the development process. Since the railroad's location is necessary for informed decisionmaking as to whether historic resources would be protected, this dearth of information violates CEQA. We disagree.

8

A description of a project's environmental setting need not be exhaustive. (*Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 88-91.) Here, the DEIR provides an adequate description of the path of the First Transcontinental Railroad and recognizes the Project "could cause a substantial adverse change in the significance of the remnant portion of . . . the First Transcontinental Railroad [route]." The FEIR noted the City has adopted measures that require preservation in place of any remaining features of the First Transcontinental Railroad.

The route has been identified adequately to allow the impact analysis required by CEQA. In addition, the mitigation measures adopted protect any remaining features of the Transcontinental Railroad route.

### Central Shops Historic District

Citizens also objects to the FEIR's description of the Central Shops Historic District. Specifically, Citizens claims the FEIR does not include an adequate discussion of the district's features, fails to explain why the boundaries were drawn so tightly around the buildings, and fails to identify archaeological resources. We disagree.

Citizens's objection to the discussion of character-defining features springs from a comment by the Department of Parks and Recreation, Office of Historic Preservation that the EIR should include a clear description of all buildings, structures, and other "district character defining features."

The DEIR designated the boundaries of the district, described the resources in the district, considered potential impacts, and proposed mitigation measures. The FEIR, using criteria established by a National Register of Historic Places bulletin (Nat. Park Service, Div. of Cultural Resources, Nat. Register Bull.: How to Complete the Nat. Register Registration Form (1997) pp. 56-57, referred to in the FEIR as the NPS Boundary Guidelines), outlined the factors for determining district boundaries. Following public comment, a boundary revision expanding the district was incorporated into the Specific Plan. More public comment ensued and the City considered the

9

objections. The City acknowledged lingering disagreement over the district's boundaries but urged that the district boundaries be approved as proposed.

According to Citizens, the FEIR inadequately discussed the character-defining features of the district.

Noting that the Office of Historic Preservation commented that there was no documented justification for the drawing of the district's boundaries, Citizens contends the City's response to this comment was inadequate.

The City set forth the criteria that it considered in drawing the district boundaries. The City utilized the NPS Boundary Guidelines for historic districts, which provide that the boundaries should "encompass the single area of land containing the significant concentration of buildings, sites, structures, or objects making up the district. The district's significance and historic integrity should help determine the boundaries." In addition, the NPS Boundary Guidelines suggest consideration of the following factors: visual barriers, visual changes in the character of the area, boundaries at a specific time in history, and clearly differentiated patterns of historical development.

Citizens also claims the FEIR failed to adequately respond to the Office of Historic Preservation's comments that the district's boundaries were too narrowly drawn. In response, the FEIR stated the district's boundaries were consistent with the NPS Boundary Guidelines since the "Central Shops Historic District is a geographically definable area which possesses a significant concentration, linkage, and continuity of contributing resources that are united by past events, aesthetic features, and physical development . . . ."

We disagree with Citizen's characterizaton of the City's response as "conclusory." The FEIR addresses the Office of Historic Preservation's concerns sufficiently, revealing the rationale behind the boundaries. The City considered and provided a thoughtful response to public comments. Nothing more is required.

### Archaeological Resources

Citizens contends the FEIR did not properly respond to the comments of the Office of Historic Preservation concerning archaeological resources and failed to identify such resources. According to Citizens, the archaeological deposits in the Specific Plan area, which include a wealth of information, will be impacted and potentially destroyed.

The Office of Historic Preservation stated the site's archaeological deposits "have the potential to provide unique and significant information on prehistoric through early historic Native American cultures, the early Gold Rush period, the development of the Transcontinental Railroad, the interrelationship of different ethnic communities in early Sacramento, and the development of one of the largest industrial complexes on the West Coast." The office requested that identification and evaluation of archaeological deposits take place prior to construction.

The DEIR described the existing setting and identified archaeologically sensitive areas and the types of resources that might be found in the areas. The DEIR also identified measures to mitigate potential impacts to archaeological resources. However, the DEIR did not specifically identify archaeological sites because the area is covered with buildings and fill. Given the physical constraints, predictions as to the location of archaeological resources have been made through research into the archival record and previous experience in identifying other archaeologically sensitive areas.

In response to the Office of Historic Preservation's concerns, the FEIR provided more information. In response to queries concerning mitigation measures, the City rewrote one mitigation measure, explained the specifics of others, and provided a lengthy description of the identification of historic resources.

The FEIR also set forth a mitigation measure applicable to the entire Project. A monitoring and unanticipated discovery plan is required for each phase of the Project. The plan will be prepared by a qualified archaeologist and must be approved by the City's preservation director prior to any earth-moving activities.

11

Citizens objects to the adequacy of the mitigation measure, arguing the FEIR fails to provide information on the timing of excavation strategy, techniques to be utilized, or preconstruction identification of archaeological sites. During oral argument the trial court discussed Citizens's objections. The court noted: "There is no law, no case law even in a program EIR situation, and even in a situation when the initial evidence is very strong that there's multiple archeological [*sic*] sites of one type or another, variety of historical buildings that a thorough detailed specific assessment and identification of all of the historical archeological [*sic*] resources be done at the outset with the identification of specific mitigation measures as opposed to requiring it in a staged fashion consistent with the kind of mitigation measures suggested in the EIR." Both at oral argument before the trial court and on appeal, Citizens concedes there is no authority to support its argument concerning archaeological resources. Nonetheless, Citizens contends we should construe CEQA to require an EIR to identify the archaeological and historic resources prior to construction. However, CEQA imposes no such stringent requirement. CEQA only requires an agency to respond to comments questioning its environmental analysis to reflect a good faith and reasoned analysis. (CEQA Guidelines, §§ 15088, subd. (c), 15204.)

**Water Quality Impacts**

Citizens argues the FEIR failed to provide adequate information about water quality impacts caused by the Specific Plan; it did not adequately describe the soil and groundwater contamination levels on the site, discuss the necessary cleanup levels, analyze the toxic impact of storm water runoff from the site, and respond to proposed reasonable mitigation measures and concerns expressed by Water Quality.

Under CEQA, an agency must respond to queries regarding significant environmental issues with good faith, reasoned responses. (CEQA Guidelines, §§ 15088, subd. (c), 15204.) The EIR addressed Water Quality's concerns regarding "Hazards and

12

Hazardous Substances" and "Hydrology and Water Quality" in detail.  Citizens's primary focus appears to be with the adequacy of the City's responses.

**Soil and Groundwater Contamination**

### *Volatile Organic Compounds*

At the outset, Citizens faults the FEIR's response to Water Quality's comment that "An evaluation also needs to be made for the potential for vapor intrusion from VOC [volatile organic compound] pollution in the groundwater in the [Sacramento Station] area.  It is likely that the vapor intrusion pathway was not evaluated [in] 1994 to the standards that are applied today."

The DEIR stated that remediation in the Sacramento Station area had been mostly completed and that a deed restriction was recorded requiring full remediation of the area prior to redevelopment activities.  According to the DEIR, contamination by VOC's was not widespread and occurred only in a few limited areas.  In addition, the DEIR listed remediation methods for potential VOC impacts.  (AR 1605)

The FEIR, in addressing Water Quality's concerns, explained that mitigation measure No. 6.5-3(e) was revised to ensure that compliance with building design requirements will prevent "the intrusion of subsurface vapors into buildings and enclosed spaces" and "would apply to the existing Sacramento Station and Central Shops buildings."  This approach, which ties mitigation measures to future building design requirements, is compliant with CEQA.  (See *Laurel Heights*, *supra*, 47 Cal.3d at p. 418.)

Citizens argues these responses are not adequate, since VOC's may affect ambient air as well as buildings.  However, CEQA requires a good faith, reasoned response to significant environmental issues, not an exhaustive analysis of each and every potential issue.  (CEQA Guidelines, §§ 15088, subd. (c), 15204.)  The responses provided satisfy CEQA.

Water Quality also commented that the EIR's mitigation measures should consider potential exposure to contaminated soils and inhalation of VOC's from contaminated soil

and groundwater in ambient and indoor air. Citizens argues the FEIR failed to adequately respond to the risk of exposure in ambient air.

The FEIR discussed the risk to construction workers during earth-disturbing construction activities. During soil remediation activities air is monitored under an air monitoring plan, asbestos contingency plan, and a health and safety plan. These plans provide guidelines for monitoring and controlling potential exposure to airborne emissions of VOC's and airborne dust containing metals. Monitoring stations are located throughout the Specific Plan area.

In addition, the FEIR stated no development may take place until a particular development site has been cleaned to DTSC target cleanup level standards. On-site air quality monitoring is a "component of the *construction worker* health and safety plan required under Mitigation Measure 6.5-1(b) and (c)."

Mitigation measure No. 6.5-3(e) requires buildings to be designed according to code specifications to prevent the intrusion of subsurface vapors into buildings and enclosed spaces. Before the City issues a grading permit or occupancy permit, the applicant must demonstrate proper design features to the City's satisfaction.

Citizens contends the FEIR's response is inadequate, in part because the FEIR does not cross-reference its response to Water Quality's comment: "Therefore, the public would have no means of learning where to look in the FEIR for the answer to Comment 6.9. CEQA does not require the public to search the FEIR to find an answer to a comment. Failing to identify the response to a comment violates the public participation policies of CEQA."

The public should not have to sift through mountains of material to ferret out the basic assumptions being used in environmental analysis. However, the responses to Water Quality's comments are clearly indicated—this is not a case of looking for a needle in a haystack or burying pertinent information in obscure minutiae.

14

Citizens also contends the FEIR's response is directed at mitigating risks to only construction workers, leaving the residents vulnerable to airborne contaminants. However, the air monitoring mitigation measures are designed to protect occupants as well as construction workers.

*Runoff Impacts*

Citizens says the EIR's response on storm water runoff is inadequate because it fails to provide information about the impact of runoff from contaminated soil on the site. Water Quality opined that if construction was not limited to the dry season, impacts should be mitigated by containing the runoff and either discharging it to a storm sewer system or physically treating the runoff prior to land or surface water discharge.

The FEIR states contaminants at the site are managed by DTSC in consultation with Water Quality as part of a separate remediation project. According to the FEIR, the DEIR "does not need to further evaluate how existing contaminants in stormwater runoff will be managed." Storm water runoff from graded portions of the site will be controlled in accordance with the City's "Storm Water Quality Improvement Plan." Construction affecting more than one acre falls under the National Pollutant Discharge Elimination System (NPDES) general construction permit. Collectively, these systems and entities address contamination of surface water by storm water runoff.

Water Quality also proposed mitigation to combat the potential for contaminated surface water to be released into groundwater. Water Quality proposed two measures: Project design should minimize the amount of pervious surfaces; and runoff should be retained in a lined basin for gradual discharge into the storm sewer system to delay surge of peak flows. Citizens contends the EIR failed utterly to adequately respond to these comments.

Mitigation measure No. 6.6-1 in the DEIR requires the landowner to minimize the migration of contaminated runoff into receiving water bodies in compliance with NPDES requirements, the City's Storm Water Quality Improvement Plan, and the implementation

15

of an erosion and sediment control plan. The FEIR states monitoring of groundwater pollutant levels will be reported by the landowners to DTSC and Water Quality. If necessary, the City will take corrective action and notify DTSC.

Citizens also claims the FEIR failed to respond to Water Quality's comment that it should include information about the cleanup levels of VOC's in groundwater and the vadose zone. However, the FEIR discussed groundwater quality and analyzed site investigation and cleanup. The FEIR determined these concerns fell within the scope of DTSC's analysis of the separate remediation project and the information requested was not a significant environmental issue.

We find the FEIR's responses to Water Quality's concerns both reasoned and made in good faith.

## Accuracy of the Project Description

Citizens argues the City impermissibly changed the Project description in the transition from the DEIR to the FEIR and Development Agreement. According to Citizens, the FEIR and Development Agreement allow more retail development than the DEIR, and the FEIR eliminated all Project phasing that had been included in the DEIR. These changes render the Project description "unstable."

An accurate project description is necessary to determine the scope of environmental review. Only an accurate view of the scope of a project can provide decision makers and the public with the information necessary to balance the project's benefits against its environmental costs and to evaluate the efficacy of mitigation measures. (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 199.)

### *Amount of Retail Development*

Citizens argues that the amount of retail space approved in the Development Agreement exceeded that outlined in the DEIR. The trial court rejected this argument, finding the "type and maximum amounts of land that would be developed in the [Specific

16

Plan] area do not shift even though, to respond to market demands, their extent and order of development is flexible."

Citizens argues the Development Agreement the City approved allows the landowner to develop a total of 1,870,190 square feet of retail space, an amount greater than the approximately 1.4 million square feet of retail space described in the public review draft of the Specific Plan, released after the DEIR comment period closed. Since the Development Agreement increased the amount of retail space, the DEIR did not analyze the resulting increased traffic and other environmental impacts.

The Development Agreement grants the applicant a vested right to develop the property in a manner substantially consistent with the "Development Plan" and "with the Plans and Project Entitlements." The Development Agreement describes the Development Plan as "The Landowner's plan for Development of the Property for the Project pursuant to the Specific Plan and based on the EIR Analysis Scenario as modified in terms of the schedule of development in the Initial Phase Development Plan by the Phase 1 Development Plan."

The DEIR states that the Specific Plan's five land use designations allow for "some combination of typical land uses, such as office, commercial, residential, and open space. . . .

"In order to provide as much flexibility as possible, the Specific Plan sets maximum densities for each use that would be allowed within the three mixed use land use designations . . . . The Specific Plan does not, however, proscribe any particular mix of uses within each category or block. Consequently, allowable development for each use that is developed in the future will depend, in part, on the amount of development capacity that is taken up by other uses."

The uses allowed in the mixed land use designations of the Specific Plan are permitted to vary in amount, subject to specified maximum densities and intensities by parcel and specified maximum amounts within the entire Specific Plan area. The pace of

17

development within these maximum densities may respond to market demands. This flexibility to respond to market forces does not change the mixed-use character of the Specific Plan development. No single category of land use can expand beyond the specified maximums to the point where other land uses are excluded. In this respect we find the Project description accurate.

### *Phasing Program*

Citizens argues the Project description shifted or is inconsistent as to whether the Specific Plan includes phasing. According to Citizens, the DEIR contained a four-phase development schedule; however, the FEIR abandoned the phased approach.

The FEIR, reflecting the Specific Plan's flexible approach to land use, states the Project does not include any "per se" or "specific" phasing program. The FEIR states: "Notwithstanding the lack of a project phasing program, because the EIR, especially the traffic and related analyses, requires the use of specific horizon years for analytical purposes, the Draft EIR presented a set of assumptions about an initial phase of the project that were used in the analysis, as discussed in Chapter 3 of the Draft EIR."

The trial court found the Specific Plan Development Agreement sets forth phasing plans for the development of mixed uses, roads, parking, public facilities, and infrastructure. The fact that the phasing plan might become outdated or be discarded in response to market conditions did not change the Specific Plan's Project description.

We agree. The phasing plans are based on current market conditions and are subject to change based on changing market conditions. Such flexibility does not change the Specific Plan's Project description, which sets forth specified types and maximum amounts of land use.

### The Cistern

Citizens labels the FEIR's analysis of the cistern, a component of the Specific Plan's storm water management system, improper segmentation in violation of CEQA. According to Citizens, the City segmented the FEIR by failing to specify when the cistern

would be built and failing to provide design details or an analysis of impacts stemming from its construction.

To comply with CEQA, an agency must evaluate the whole of any project that may result in either direct or reasonably foreseeable impacts on the environment. (CEQA Guidelines, § 15378, subd. (a).) An agency may not segment parts of the project by splitting it into pieces. Such segmentation can minimize consideration of a project's environmental consequences in violation of CEQA. (*Burbank-Glendale-Pasadena Airport Authority v. Hensler* (1991) 233 Cal.App.3d 577, 592.)

The cistern forms a part of the Specific Plan's storm water facilities. Ultimately, the Project foresees replacing the City's existing drain system, which currently discharges sewer and storm water into the sewer system, with a new gravity system of pipelines and inlets that will drain into an underground storage facility, the cistern.

The DEIR provides a description of the cistern: "The cistern would serve as a means of providing additional detention capacity and as a stormwater quality-management facility. The cistern would be able to store approximately 27 acre-feet, which would be sufficient to capture the 'first flush' of a storm event for water quality purposes. . . . The cistern would have two compartments: the first would capture the most polluted stormwater runoff from the first flush. Up to one-third of the entire water quality volume (approximately five acre-feet) would be pumped at about five cubic feet per second rate into the [existing sewer-storm water system]. The residual two-thirds of the water quality volume (approximately 10 acre-feet) would discharge to the Sacramento River over the course of 24 to 48 hours. . . . Drainage flows that exceed the first-flush storage capacity would be collected in the second chamber and then pumped to the Sacramento River."

The FEIR, responding to comments, provided a further description of the cistern. The Sacramento Department of Utilities reviewed and approved a technical memorandum analyzing the Project's storm drain system. Although the date of the cistern's

19

construction is not established, the FEIR requires that prior to construction "the proposed project would be required to submit drainage and wastewater studies prior to the submittal of improvement plans to demonstrate the drainage runoff and sewer generation amounts that will contribute towards the maximum peak flow . . . ."

Citizens faults the FEIR's description of the cistern for failing to provide "the dimensions of the cistern, design details, and maintenance requirements for the Cistern." However, an EIR does not have to provide working drawings or blueprint-level detail of a project's components. Instead, the EIR must provide sufficient detail to understand the project's possible environmental impacts. (*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 27-28.)

In the alternative, Citizens contends the FEIR fails to analyze the environmental impacts of constructing the cistern. However, in conjunction with construction of the cistern, the City adopted mitigation measure Nos. 6.11-1 and 6.11-2. Measure No. 6.11-1 states that prior to completion of the cistern, the City shall limit development of the Project so that the combined wastewater and storm water flows do not exceed the Project's peak flow sewage generation rate of 9.43 million gallons per day. Measure No. 6.11-2 provides that the City shall limit development of the Project so that the combined wastewater and storm water flows do not exceed a flow rate of five cubic feet per second until the cistern and outfall for storm water flows are constructed, and/or planned sewer-storm water system improvements for wastewater flows are implemented.

Mitigation measures to mitigate particulate emissions from the construction of the cistern are provided. These measures include watering all soil to maintain moistness; maintaining two feet of freeboard space on haul trucks; expeditious removal of mud or dirt from adjacent public streets at the end of each workday; installation of wheel washers for all exiting trucks, or washing off of all trucks and equipment leaving the site; suspension of excavation and grading activity when winds exceed 20 miles per hour;

20

periodic watering of exposed surfaces, including haul roads; and limiting vehicle speeds on unpaved roads to 15 miles per hour.

**Traffic Impacts**

Citizens mounts a multipart attack on the adequacy of the FEIR's analysis of traffic impacts. Specifically, Citizens argues (1) the scope of the traffic study is too limited, (2) the EIR is required to include a queuing analysis for downtown intersections, (3) the City failed to consider mitigation measures for 44 intersections, (4) the FEIR does not include mitigation measures for a freeway ramp, and (5) fee-based mitigation of an interchange does not comply with CEQA.

### *Traffic Study Scope*

Preliminarily, Citizens points to expert opinion in opposition to the Specific Plan that the FEIR should analyze the intersection on the west side of the I Street Bridge in West Sacramento. According to Citizens, traffic studies are generally required to analyze all intersections that may attract 100 or more peak-hour trips based on their projected impact. Plaintiff's traffic engineer stated the Specific Plan would generate more than 100 peak-hour trips through an intersection just west of the I Street Bridge.

The DEIR states the traffic study area was defined in collaboration with the City's and Caltrans's staff based on anticipated volume and distributional patterns of traffic and known locations of operational difficulty. The two entities agreed upon a geographic region to be studied that includes 64 intersections, 32 street segments, 11 freeway segments, 11 freeway merges/diverges/weaves, and six freeway ramps.[1]

---

[1] Citizens notes Caltrans requested analysis of traffic impacts for the entire freeway ring surrounding the Sacramento central area. However, as the trial court noted, Citizens failed to present any evidence in support of its request for additional traffic studies to indicate that evaluation of additional locations would generate additional significant information about traffic impacts or was otherwise necessary to a valid traffic study. In addition, Caltrans, on whose comments Citizens relies, never pursued its general request

21

As for Citizens's claim that traffic studies typically are required to analyze all intersections that may result in 100 additional peak-hour trips, the FEIR explained that the City's traffic engineers concluded the Specific Plan would result in no significant impacts to "intersections west of intersection #48" (the intersection just west of the I Street Bridge). This conclusion was based on the result of an assessment incorporating traffic demand models developed by the Sacramento Area Council of Governments (SACOG) and standard trip generation procedures, adjusted to reflect dense development in an environment much like downtown Sacramento.

In addition, the FEIR pointed out traffic studies are not required to analyze all intersections that may result in 100 peak-hour trips. The City's standard regulation uses the 100 peak-hour trip threshold as an overall measure to determine whether any traffic study is required for a project, not whether a particular intersection must be studied.

Under CEQA, an EIR must identify and analyze potentially significant environmental impacts. (CEQA Guidelines, § 15126, subd. (a).) We reject challenges to the EIR's scope of analysis if substantial evidence supports the agency's decision and the EIR is not clearly inadequate or unsupported. (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1259.) In determining the geographic reach of the traffic study, the City relied on expertise and advice from its own staff and Caltrans's staff as well as traffic demand models developed by SACOG. We find substantial evidence supports the traffic study's geographic delineation.[2]

for additional studies. Instead, Caltrans requested a modification of the FEIR's measures for mitigating impacts to freeways.

[2] Citizens argues we do not apply the substantial evidence test, but instead determine the issue as a matter of law de novo. We disagree. Citizens contends the FEIR violated CEQA's procedural provisions by omitting information and failing to provide a reasoned response to expert comments. However, Citizens's argument concerns the adequacy of the traffic study scope and questions the City's reasoning behind its analysis. These are

*Traffic Queues*

Citizens contends the EIR should have analyzed the impact of excessive traffic queueing at downtown intersections. The dearth of information on this subject deprived decision makers of information about significant environmental impacts in violation of CEQA.

Citizens's traffic engineer postulated that an analysis of queuing was necessary to understand the traffic impact of the Specific Plan, noting "there is a reasonable expectation that queues from those intersections might stack back sufficiently to impact upstream intersections, creating gridlock conditions." In response, the FEIR stated the City does not currently assess traffic queues except on freeway exit ramps, where excessive queueing may impede freeway operations. In addition, "Excessive queuing on city streets is expected to occur at intersections where level of service and delay estimates are high. Excessive queues on city streets are not as critical as queues that affect freeways because vehicles on city streets may not legally block upstream intersections."

The EIR does provide analysis of traffic queues under several conditions, with and without mitigation. The City analyzed the impacts using software designed to estimate levels of service and potential delay. Utilizing this software, queues are reported for all approaches to all intersections, and queues that cannot be accommodated within available storage areas, turn bays, and between intersections are identified.

As the trial court noted, traffic queues were adequately studied using computer modeling, and shifts in traffic patterns and route choices resulting from development were taken into account by using a computer model from SACOG. In addition, the City relies on the requirement that the Project optimize signal timing.

---

questions of the factual basis for the FEIR's conclusions, not questions of omissions or procedural failures.

23

***Mitigation Measures for 44 Intersections***

Citizens faults the DEIR's "summary dismissal" of mitigation for 44 intersections within the Specific Plan area. According to Citizens, the DEIR based its conclusion that mitigation would not be feasible on the DEIR's determination that any mitigation would conflict with the City's pedestrian-friendly street design guidelines and "Smart Growth" policies that discourage the addition of traffic lanes. Citizens disputes this conclusion.

The DEIR concluded there was no additional mitigation for the 44 intersections other than the widening of roadways. The City found widening or restriping the roadways, suggested by Citizens, was not feasible because these actions were contrary to the City's adopted "Smart Growth" principles and policies. These actions would also conflict with the City's objective of providing pedestrian-friendly streets. In addition, widening streets would create secondary impacts to adjacent properties through acquisition of additional rights-of-way for new lanes.

Citizens criticizes the City for applying these pedestrian-friendly guidelines "on a blanket basis to supersede the General Plan traffic level-of-service criteria and standard of significance adopted in the EIR." However, the FEIR stated that the DEIR "does not imply that the pedestrian-friendly street goal supersedes the City's level-of-service policy. It is one factor to be considered in determining whether to override a residual significant level-of-service impact. Other considerations including impacts to adjacent properties and financial viability were considered in determining whether additional mitigation would be feasible."

The City's General Plan identifies level of service as a goal, not a mandatory policy, providing that City "[w]ork[s] towards achieving an overall Level of Service C on the City's local and major street systems." The City's Smart Growth policies were part of the formulation of the Specific Plan and are also General Plan policies. In addition, the FEIR noted that good-faith attempts were made to mitigate level-of-service impacts on arterial streets where feasible. It is within the City's discretion to balance competing

24

policy goals. (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1336-1338.)

Citizens does not contest that in determining whether a mitigation measure is feasible "the City may consider economic, legal, social, and technological factors and to an extent desirability." However, Citizens argues the City must identify the mitigation measure for each and every one of the 44 intersections "and then determine on an intersection-by-intersection basis whether the mitigation is infeasible based on the conditions at the intersection and application of the City's pedestrian-friendly guidelines as well as other environmental factors."

Citizens concedes no authority supports its argument yet urges us to adopt such a requirement. We decline. The City may reject mitigation measures if it finds them to be not feasible on the basis of specific economic, legal, social, technological, or other considerations. (CEQA Guidelines, § 15091; Pub. Resources Code, § 21080, subd. (a).) Such a determination is based on a reasonable balancing of the relevant factors. (CEQA Guidelines, § 15364.) CEQA does not mandate a stringent, exhaustive consideration of each and every environmental impact to be analyzed, but a general balancing of the factors in support of or in opposition to mitigation.

Here, the City balanced the competing policy considerations in determining the feasibility of mitigation measures on intersections within the Specific Plan area. Substantial evidence supports the FEIR's conclusion that widening or restriping roadways was not feasible.

### Interstate 5 Off-Ramp

According to Citizens, the FEIR provides no mitigation for the initial phase of the Specific Plan's impact on the Richards Boulevard/Interstate 5 off-ramp in the southbound direction. Since Caltrans stated the Project would cause traffic queues that might create a safety hazard, the failure to provide such mitigation violates CEQA.

25

In commenting on the DEIR, Caltrans requested that the City expand its analysis of freeway impacts. In response, the City consulted with Caltrans to address improvements to the state highway system and modified the mitigation measures set forth in the DEIR to reduce potential impacts. Substantial evidence supports the City's assertion that it identified all feasible mitigation measures for freeway ramps, including the off-ramp in question.

### Fee-Based Mitigation

Citizens disputes that the fee-based mitigation proposed by the City for the Richards Boulevard interchange satisfies CEQA. The FEIR proposes replacing the existing Richards Boulevard interchange with a split diamond interchange. Citizens contends the fee-based mitigation is not part of an enforceable plan.

Fair-share payments may adequately mitigate impacts if they are "part of a reasonable plan of actual mitigation that the relevant agency commits itself to implementing." (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1188.) In *Anderson First*, an EIR proposed highway improvements to alleviate traffic impacts and concluded the impacts could be mitigated to a less than significant level. The appellate court held that the EIR had to include an identification of the required improvement; an estimate of the cost of the required improvement; sufficient information to determine how much the project would pay toward the improvement; and a requirement that fees be part of a reasonable, enforceable plan sufficiently tied to the mitigation. (*Id.* at pp. 1187-1190.)

Citizens contends the DEIR fails to establish the fees are part of a reasonable, enforceable mitigation plan and when mitigation will take place. However, the fair share mitigation fees outlined in the EIR satisfy these two requirements. The City adopted mitigation measures that identify traffic improvements to reduce specific traffic impacts and tie the fee payments to the improvements. The City also adopted a Public Facilities Financing Plan (Financing Plan), which includes the costs of the improvements. In

addition, the method for determining the fair share payments is set forth in the Financing Plan and is part of an enforceable program.

Citizens argues the EIR's reliance on a future nexus study connotes a failure to identify the amount of the Specific Plan's fair-share contribution. In fact, Citizens claims, there is no evidence that the proposed fees are anything more than a "proposal."

The DEIR estimated the costs of roadway improvements needed to mitigate the Specific Plan's significant traffic impacts. In calculating Project contributions, the DEIR states, "[t]he applicant's fair share contribution shall be calculated pro rata, on a per unit and/or square foot basis, based upon the land uses identified in development applications submitted to the City." Under the Financing Plan, a nexus study will be prepared to determine how public facility costs are allocated among the new development benefiting from the facility and infrastructure improvements.

The fair share mitigation measures are enforceable through the Financing Plan, tentative map conditions of approval, and the Development Agreement. In addition, building permits are conditioned on payment of the fair-share contribution to the City.

The FEIR identified development of a split-diamond interchange at Interstate 5 and Richards Boulevard as mitigation. The Financing Plan includes allocation for this improvement by 2030. The Financing Plan estimates $69,681,000 for the building cost for freeway improvements, including "Initial phase estimate of improvement costs based on the I-5 Richards Interchange Ultimate Split Diamond cost estimates." The FEIR states the Specific Plan is "required to provide fair-share funding for these interchange improvements through payment of development impact fees as specified in the Financing Plan." The FEIR's determination that the fair-share plan will mitigate the impact on the Richards Boulevard interchange is supported by substantial evidence and satisfies CEQA.

**Air Quality Impacts**

Citizens argues the EIR fails to adequately analyze $PM_{10}$ and $PM_{2.5}$ emissions from Project construction and mitigate them to less than significant levels. According to

27

Citizens, the City imposed no limitation on the amount of land that could be graded within the railyards at any one time, and therefore the FEIR's proposed mitigation measures were inadequate.

The DEIR analyzed potential impacts on air quality from fugitive dust particulate matter emissions during the 20-year anticipated life of the Specific Plan. The DEIR found that compliance with seven proposed mitigation measures would decrease fugitive dust ($PM_{10}$) impacts to a less than significant level. In reaching this conclusion, the DEIR followed approaches set forth in Air Quality's "Guide to Air Quality Assessment in Sacramento County." Air Quality supported approval of the Specific Plan, noting all issues identified had been addressed.

The trial court found the City's air quality evaluation complied with CEQA. The court noted the DEIR set forth seven mitigation measures to reduce particulate matter based on the $PM_{10}$ threshold of significance recommended by Air Quality. In addition, the court pointed out the FEIR explained that construction would be occurring on subareas much smaller than the total Project area at any given time, and the construction particulate control measures were appropriate to the intensity and area of activity for each Project phase described in the FEIR.

However, Citizens argues that Air Quality's screening guidelines are not sufficient and the City should have conducted a more detailed analysis to ensure the Project's impacts would be mitigated. According to Citizens, Air Quality's mitigation measures adopted by the FEIR are designated as "level one" mitigation. The City improperly adopted the mitigation measure, since level one mitigation applies only to an actively disturbed area of between 5.1 and 8 acres, and the City failed to impose an 8-acre limit on grading.

The FEIR states that Specific Plan development will occur in several phases over various subareas of the Project over a span of about 20 years. At any given point in time, construction activity will be occurring on portions of the Project site that are much

28

smaller than the entire site. The City incorporated Air Quality's "Rule 403" to ensure that particulate emissions during grading and construction will be less than significant using conservative assumptions regarding the number of acres to be graded at any one time.

Substantial evidence supports the trial court's conclusion that mitigation measures derived from Air Quality, coupled with conservative assumptions about the number of acres to be graded at one time, adequately address the impact of emissions from Project construction.

Citizens also contends the City used "an incorrect standard of significance" for TAC's. CEQA defines "threshold of significance": "Each public agency is encouraged to develop and publish thresholds of significance that the agency uses in the determination of the significance of environmental effects. A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." (CEQA Guidelines, § 15064.7, subd. (a).)

The lead agency determines whether an environmental impact is significant and also determines the corresponding threshold of significance. In exercising this discretion, the agency may rely on threshold of significance data developed by experts, and may also rely on a regulatory agency. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2010) 91 Cal.App.4th 342, 362-363; *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 625-626.)

Thresholds of significance do not automatically determine whether an environmental impact will be significant. Instead, they serve as a marker to determine whether a particular impact will normally be determined to be significant or less than significant. (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1108-1109.)

29

Citizens argues its expert presented evidence that use of a 100-in-one-million standard would create excessive cancer risk. According to Citizens, typically cancer risks from construction equipment are compared to the significance threshold of 10 in one million.

Air Quality is the agency responsible for TAC emissions, which contain diesel particulate matter (DPM), in the Project area. However, Air Quality does not have a threshold of significance to recommend on TAC emissions.

The DEIR recognized that Project construction and operations would cause TAC emissions. To evaluate the potential health impacts from exposure to DPM, the primary TAC of concern, two health risk assessments were prepared by the ENVIRON Corporation.

One of the health risk assessments evaluated the potential cancer risk to the community surrounding the Project area from chemicals that may become airborne during construction on contaminated soil and from DPM emissions from construction equipment. Using computer modeling, the assessment estimated emissions from construction activities on 23 parcels within the Project area during four phases of Specific Plan development. The assessment also utilized guidance from both the state and federal Environmental Protection Agencies to estimate cancer and noncancer hazard risks from emissions and applied the National Contingency Plan (NCP) target cancer risk levels, a lifetime incremental cancer risk not in excess of one in a million to 100 in a million. The assessment determined that the health risk from soil and DPM emissions during construction activities fell below the NCP target risk levels for airborne soil chemicals and was slightly higher than the 10 in a million for DPM emissions, a risk level that would likely be reduced to less than 10 in a million by mitigation measures such as diesel particulate filters, reduced idling, and newer construction equipment. The FEIR determined a cancer risk level from DPM slightly higher than 100 in a million, a figure that would likely be reduced by 45 percent as a result of implementing an air quality

30

management plan for Project construction to a level within the NCP target risk range of one in a million to 100 in a million.

Air Quality, despite some earlier questions, ultimately accepted the TAC impact analysis. It reasoned it was sufficient for a program level analysis based on limited information about actual projects. Air Quality concurred in the methodology used in the FEIR to assess TAC impacts but noted that the methodology had evolved and future projects may be required to use a different or modified analytical approach.

Citizens, relying on its expert's opinion, contends the qualitative standard used by the DEIR to assess the significance of cancer risk posed by TAC's from mobile sources should have used the standard of significance for cancer risk posed by TAC's from stationary sources. The FEIR responded to this objection by explaining the technical difficulties involved in setting a quantitative standard for cancer risk from mobile emissions. Instead, the EIR employed a qualitative standard derived by quantitative analysis based on Air Quality's protocol.

Citizens also claims that, based on its expert's opinion, the assessment of health risk to the surrounding community from construction TAC's improperly applied the NCP target levels of 100 cases per million. However, we agree with the trial court's finding that "the differing opinion of petitioners' expert on the proper application of the NCP target rate in the assessment [citation] does not clearly establish that the EIR's application of the target rate was wrong. [Citation.] And the update in the assessment did not change the standard of significance in the Final EIR: the DPM data changed but the NCP target range remained the same."

The health risk assessment states: "The National Contingency Plan (NCP) (40 Code of Federal Regulations [CFR] §300) is commonly cited as the basis for target risk and hazard levels. According to the NCP, lifetime incremental cancer risks posed by a site should not exceed one in a million ($1 \times 10^{-6}$) to one hundred in a million ($1 \times 10^{-4}$), and noncarcinogenic chemicals should not be present at levels expected to cause adverse

31

health effects (i.e., HI greater than one)." The health risk assessment also notes that other agencies have reached different conclusions regarding the toxicity of DPM. The assessment concludes: "Consistent with the findings of CalEPA, other health agencies and scientific bodies have concluded that diesel exhaust is a probable human carcinogen. However, with the exception of the World Health Organization (WHO), these agencies have concluded that there is insufficient information from which to determine a quantitative dose-response relationship and thus to derive a unit risk factor." The City did not abuse its discretion in utilizing a standard based on Air Quality's protocol.

## DISPOSITION

The judgment is affirmed. The City shall recover costs on appeal.

<u>          RAYE          </u>, P. J.

We concur:

<u>     NICHOLSON      </u>, J.

<u>        HULL            </u>, J.